# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| DAVID A. ABRAMS, No. 241224, a/k/a ABRAHAMS,<br><br>        Plaintiff,<br><br>  v.<br><br>WARDEN SCOTT ERFE, CAPTAIN JOHN WATSON, MAINTENANCE SUPERVISOR JOHN DOE, AND COUNSELOR TRAPP, sued in their individual and official capacity; and COUNSELOR SUPERVISOR PETERSON, sued in her individual capacity,<br><br>        Defendants. | Civil Action No.<br>3: 17 - CV - 1570 (CSH)<br><br><br><br><br>FEBRUARY 2, 2018 |

## INITIAL REVIEW ORDER

**Haight, Senior District Judge:**

The plaintiff, David Abrams, *pro se* and currently incarcerated at Corrigan-Radgowski Correctional Institution in Uncasville, Connecticut, has filed a civil rights complaint pursuant to 42 U.S.C. § 1983 against Warden Scott Erfe, Captain John Watson, Maintenance Supervisor John Doe, Counselor Trapp, and Counselor Supervisor Peterson of the Cheshire Correctional Institution ("Cheshire C.I."), where he was previously housed. Throughout his complaint, Plaintiff alleges various constitutional and state law violations. Abrams is suing Peterson in her individual capacity and all other defendants in their individual and official capacities. He is seeking monetary and declaratory relief from all defendants and an injunction against Erfe.

With respect to procedural history, Magistrate Judge Garfinkel granted Abrams's motion to proceed *in forma pauperis* on September 22, 2017. *See* Doc. 6. The Court now reviews Abrams's

1

Complaint to determine whether his claims are "frivolous" or may proceed under 28 U.S.C. § 1915A. For the following reasons, the Court dismisses his complaint in part.

## I. STANDARD OF REVIEW

Under 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint and dismiss any portion that "(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." *See* 28 U.S.C. § 1915A(b)(1)-(2). Although highly detailed allegations are not required, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S 544, 570 (2007)).[1] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than the unadorned, the-defendant-unlawfully-harmed-me accusation." *Id*. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id*. (quoting *Twombly*, 550 U.S. at 555).

"[W]hether a complaint states a plausible claim for relief will [ultimately] . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 663-64. When "well-pleaded factual allegations" are present, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at

---

[1] The Second Circuit has consistently adhered to the United States Supreme Court's seminal "plausibility" standard set forth in *Iqbal*. *See, e.g.*, *Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 94 (2d Cir. 2017); *Christine Asia Co. v. Ma*, No. 16-2519-CV, 2017 WL 6003340, at *1 (2d Cir. Dec. 5, 2017); *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 401 (2d Cir.2015); *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp.*, *PLC*, 709 F.3d 109, 119-20 (2d Cir. 2013).

679. Factual disputes do not factor into a plausibility analysis under *Iqbal* and its progeny.

"Although all allegations contained in the complaint are assumed to be true, this tenet is `inapplicable to legal conclusions.'" *LaMagna v. Brown*, 474 F. App'x 788, 789 (2d Cir.2012) (quoting *Iqbal*, 556 U.S. at 678). *See also Amaker v. New York State Dept. of Corr. Servs.*, 435 F. App'x 52, 54 (2d Cir.2011) (same). Accordingly, the Court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir.2011) (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir.2008) (internal quotation marks omitted)). Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

With respect to *pro se* litigants, it is well-established that "[*p*]*ro se* submissions are reviewed with special solicitude, and 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Matheson v. Deutsche Bank Nat'l Tr. Co.*, 706 F. App'x 24, 26 (2d Cir. 2017) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)(per curiam)). *See also Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (same)*; Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants); *Boykin v. KeyCorp.*, 521 F.3d 202, 214 (2d Cir. 2008) ("A document filed *pro se* is to be liberally construed and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.") (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (Where the plaintiff proceeds *pro se*, a court is "obliged to construe his pleadings liberally.") (quoting *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)); *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) ("In reviewing a

*pro se* complaint, the court must assume the truth of the allegations, and interpret them liberally to "raise the strongest arguments [they] suggest[]."").

Despite being subject to liberal interpretation, a *pro se* plaintiff's complaint still must "state a claim to relief that is plausible on its face." *Mancuso v. Hynes*, 379 F. App'x 60, 61 (2d Cir. 2010) (quoting *Iqbal,* 556 U.S. at 678). Therefore, even in a *pro se* case, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (citation and internal quotation marks omitted). Nor may the Court "invent factual allegations" that the plaintiff has not pleaded. *Id.*

## II. <u>FACTUAL ALLEGATIONS</u>

In January 2017, Abrams was housed at Cheshire C.I. in Cheshire, Connecticut. Doc. 1 (Complaint), ¶10. He was employed by the facility to clean the showers, for which he received twenty-one dollars per month. *Id.* Counselor Trapp (a female) was the inmate counselor for Unit 3, where Abrams resided. *Id.*, ¶¶11-12. In February 2017, Abrams asked Trapp for "state soap and envelopes . . . to which he [was] not entitled . . . because he was employed." *Id.,* ¶13. Trapp allegedly smiled at Abrams and said, "See, life can be made easy for you in here." *Id.,* ¶15. She handed Abrams four bars of soap and four pre-stamped envelopes. *Id.* Abrams replied, "Thanks, I appreciate you!" *Id.* ¶16. Trapp allegedly responded by saying, "Do you really? We'll see on my tour." *Id.*

According to Plaintiff, over the next few days, Trapp stopped by Abrams' cell door between 12:30 p.m. and 1:30 p.m. and watched him work out while wearing only his gym shorts. *Id.,* ¶17. On these occasions, Trapp allegedly smiled at Abrams and gave him a "thumbs-up" signal. *Id.* On four different occasions over the next couple of weeks, Trapp "would stop by [Abrams's] cell while

his cell window was partially covered for privacy" and watch Abrams "urinate, masturbate, and wash up while [he was] fully naked" after working out. *Id.,* ¶18. She would allegedly smile at Abrams for three to five seconds and then continue on her tour. *Id.* During this time, Trapp gave Abrams multiple bars of soap and envelopes, which Abrams sold to other inmates in the unit for profit. *Id.* ¶20.

Abrams alleges that he found Trapp to be "extremely unattractive" so he was "an unwilling participant in her inappropriate conduct." *Id.,* ¶21. Nevertheless, he did not want to report her out of "fear of embarrassment, ridicule," and retaliation, or as he describes, "what Trapp could do to him and for him." *Id.*, ¶22.

On numerous occasions, Abrams allegedly "went to see Trapp for a printout of his inmate account or to get soap and envelopes." *Id.*, ¶24. During these times, Trapp would allegedly pose provocatively, "bend[ing] over at the waist," "spread[ing] her legs while seated in front of him," and/or "lean[ing] forward with her loose-fitted, low-cut blouse" exposing her cleavage. *Id.*, ¶¶ 24-26. Abrams states that he "would laugh to himself" because he "found her unattractive" in that she was "built like a 12 year old girl." *Id.,* ¶ 25.

On March 3, 2017, Abrams argued with Trapp "over his placement at the bottom of the list for industry jobs that pay up to $150 monthly." *Id.*, ¶27. Afterward, Abrams stopped communicating with Trapp; and Trapp no longer stopped at Abrams's cell door during her tour of the unit. *Id.*, ¶¶ 27-28.

On March 13, 2017, administrators placed Cheshire on "modified lockdown" because Governor Malloy was touring the facility. *Id.,* ¶29. During this time, no inmates were permitted in any area outside of their cells except for those inmates who worked in the facility's industry unit,

which included Abrams's cellmate. *Id.*, ¶¶ 30, 33. Sometime between 11:30 a.m. and 11:45 a.m. on that date, Abrams alleges he partially covered his cell window for privacy. *Id.,* ¶ 35. He decided to take advantage of the lockdown to do personal grooming ("groom his pubic area" or perform "manscaping," as he terms it) while naked. *Id.* He retrieved his beard trimmer, removed all of his clothing, and began this task "over his toilet" in his cell. *Id.,* ¶¶ 37-38. While trimming his hair, he saw the shadow of a figure move in front of the cell window and then walk away. *Id.*, ¶¶ 40-41. Abrams could not identify the person at the window. *Id.,* ¶ 42.

Approximately ten minutes later, Abrams's cellmate returned from his industry job early. *Id.,* ¶43. He refused to enter the cell because Abrams had partially covered the window. *Id.* Correction Officer Lapointe instructed the cellmate to enter the cell and "lock up." *Id.*, ¶44. The cellmate told Lapointe to "calm down" because Abrams was using the bathroom. *Id.* The cellmate eventually entered the cell as Abrams was cleaning the toilet area. *Id.,* ¶45.

Ten minutes after the cellmate entered the cell, Counselor Supervisor Peterson and four other correction officers entered the cell to take Abrams to a segregation unit pending an investigation into a disciplinary report. *Id.*, ¶¶45-46. Abrams later learned that Trapp had issued a disciplinary report against him for intentionally exposing himself to her. *Id.*, ¶¶47-48. *See also id.*, at 30 ("Disciplinary Report," regarding incident on 3/13/2017).[2] While en route to the segregation unit, Peterson and/or

---

[2] In the Disciplinary Report, Trapp's "[d]escription of violation" states:

On Monday, March 13, 2017 at 11:45 A.M., while touring South Block 2, Inmate Abrahams intentionally exposed his penis through his boxers while I was looking through his cell door. Due to this intentional exposure, Inmate Abrahams is being issued a Class A DR for public indecency.

Doc. 1, at 30.

the other officers ordered Abrams to strip, bend at the waist, and spread his legs "in front of Peterson (a female) and other officers." *Id.*, ¶46.

On March 13, 2017, while in segregation, Abrams informed Sergeant Duquette that Trapp had sexually harassed him on previous occasions. *Id.*, ¶50. Thereafter, on March 23, 2017, Abrams wrote a letter to the Connecticut State Police requesting that charges be filed against Trapp for sexual harassment and for filing a false disciplinary report. *Id.*, ¶52. Abrams also filed multiple grievances against Trapp. *Id.*

According to Plaintiff, Captain Watson had previously implemented a new policy at Cheshire's segregation unit, mandating that inmate mail be sent out only if the inmate completed a special request form so that postage costs could be deducted from his account. *Id.*, ¶53. Abrams did not learn of this new policy until after he had mailed his March 23 letter to the state police. *Id.* His letter was "never returned to him, nor was postage deducted from his prison account." *Id.* He contacted the mail room to see if his letter was, in fact, sent out but did not receive a response. *Id.*, ¶54. Abrams has "concluded" that Cheshire staff intercepted his letter because of the allegations contained in it and "because [such interception] is known to happen when an inmate in segregation tries to contact outside intervention." *Id.*, ¶56.

While in segregation, Abrams informed Captain Watson about black mold on the vent in his cell. *Id.*, ¶57. Watson allegedly replied, "It comes off with wet tissue." *Id.* Abrams also submitted a written request to speak to someone who handles cases under the Prison Rape Elimination Act ("PREA"). *Id.*, ¶61. Captain Watson allegedly responded by claiming that "plaintiff's allegations don't qualify for P.R.E.A." *Id.*

According to Abrams, his disciplinary hearing was postponed twice, and the hearing officers

did not provide him with an "advocate" as promised. *Id.,* ¶58. On March 29, 2017, Hearing Officer King allegedly found Abrams "guilty [of indecent exposure] based on evidence, the plaintiff's testimony, and on [King's] position that 'an individual can be guilty of indecent exposure regardless if it is intentional or not.'"[3] *Id.,* ¶59. Abrams spent a total of seventeen (17) days in segregation "after a hearing with sanctions in which [ten] (10) days good time was taken from him. *Id.,* ¶60.

On March 30, 2017, Abrams contacted the PREA resource center and spoke with a female operator. *Id.,* ¶¶61-62. The operator told Abrams that his claims against Trapp did not constitute sexual harassment, but she disagreed with Officer King's assessment that an individual can be found guilty of indecent exposure if the act was unintentional. *Id.,* ¶62.

Abrams has raised multiple constitutional and state law claims against the named defendants. The Court will address the viability of each claim in turn.

## III. ANALYSIS

### A. Sexual Abuse

Abrams claims that Trapp violated his Eighth Amendment right to be free from cruel and unusual punishment by sexually harassing him on numerous occasions. Doc. 1, ¶¶64-68. The

---

[3] According to Hearing Officer King, Abrams was "advised of the hearing process" and "declined to utilized [sic] advocate services or identify any witnesses." Doc. 1, at 31 ("Disciplinary Process Summary Report" by Officer King, dated 3/29/2017). At the hearing, Abrams stated that he was secured inside his cell, he used the bathroom, and afterwards he was manscaping." *Id.* Abrams "further stated that he had partially covered his cell window for privacy" and "never knew CC Trapp was in the unit" and "never exposed himself intentionally to her." *Id.* Trapp "reported that inmate [Abrams] was observed in his boxers with his penis showing through the slit of the boxers intentionally exposing himself." *Id.* "A review of the unit logbook confirms and acknowledges CC Trapp['s] announcement was made [of a] female in [the] unit." *Id.* Disciplinary Hearing Officer King "found the inmate guilty at the hearing based on the evidence, staff observation and documentation submitted." *Id.* Moreover, '[t]he inmate was advised of the appeal process at the hearing." *Id.*

Eighth Amendment sets constitutional boundaries on the conditions of imprisonment. "The 'unnecessary and wanton infliction of pain' on a prisoner constitutes cruel and unusual punishment in violation of the Eighth Amendment." *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) (citing *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).

To state an Eighth Amendment claim, "a prisoner must allege two elements, one subjective and one objective." *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015). First, the prisoner must allege that "the defendant acted with a subjectively 'sufficiently culpable state of mind.'" *Id.* (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). Second, the conduct alleged must be "objectively 'harmful enough' or 'sufficiently serious' to reach constitutional dimensions." *Id*. (quoting *Hudson*, 503 U.S. at 8). *See also Boddie*, 105 F.3d at 861 ("Because sexual abuse by a corrections officer may constitute serious harm inflicted by an officer with a sufficiently culpable state of mind, allegations of such abuse are cognizable as Eighth Amendment claims.").

First, as to objective harm, "[a]nalysis of the objective prong is context specific," *Crawford*, 796 F.3d at 256 (citation and internal quotation marks omitted). "Sexual abuse may violate contemporary standards of decency and can cause severe physical and psychological harm." *Boddie*, 105 F.3d at 861. Therefore, "severe or repetitive sexual abuse of an inmate by a prison officer can be 'objectively, sufficiently serious' enough to constitute an Eighth Amendment violation." *Id.* Moreover, "sexual abuse of a prisoner by a corrections officer has no legitimate penological purpose." *Id.*

Second, as to subjective state of mind, "[w]here no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct, the abuse itself may, in some circumstances, be sufficient evidence of a culpable state of mind." *Id.* "Accordingly, allegations of

sexual abuse may meet both the subjective and the objective elements of the constitutional test, thereby stating an Eighth Amendment claim under Section 1983." *Id*.

"[N]ot every malevolent touch by a prison guard gives rise to a federal cause of action," but the Eighth Amendment is nevertheless violated by "conduct that is repugnant to the conscience of mankind." *Crawford*, 796 F.3d at 256 (citation and internal quotation marks omitted). Actions are deemed "repugnant to the conscience of mankind" if they are "incompatible with evolving standards of decency" or involve "the unnecessary and wanton infliction of pain." *Id.* (citation omitted).

In order to determine whether alleged sexual abuse rises to the level of an Eighth Amendment violation, one must examine the particular facts set forth in the claim. In *Boddie*, the Second Circuit held that the prisoner "failed to state an Eighth Amendment claim after a female corrections officer made a pass at an him, squeezed his hand, touched his penis, called him a 'sexy black devil,' and bumped into him 'with her whole body vagina against penis.'" *Crawford*, 796 F.3d at 257 (discussing *Boddie*, 105 F.3d at 859-60). "We concluded [in *Boddie*] that no single incident was sufficiently serious and that the series of incidents were not 'cumulatively egregious' enough to reach constitutional dimensions." *Id.* (citing *Boddie*, 105 F.3d at 861).

In *Crawford*, the Second Circuit expanded the standard for sexual abuse of prisoners*,* holding that "[a] corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment." 796 F.3d at 257. "[T]he principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." *Id.* at 257-58. Concluding that the latter had occurred – when Corrections

Officer Prindle "fondled" and "squeezed" the penis of prisoner Corley and thereafter "fondled [inmate] Crawford's penis and roamed his hands down Crawford's thigh," with no connection to "any legitimate duties – the Second Circuit held that such "unjustified conduct . . . [was] unquestionably repugnant to the conscience of mankind and therefore violate[d] the Eighth Amendment. *Id.* at 258 (citation and internal quotation marks omitted).

In so holding, the *Crawford* court confirmed that the "standard set forth in *Boddie* . . . remains the same today[;] [b]ut in determining the application of that standard, the Eighth Amendment requires courts to 'look beyond historical conceptions to the evolving standards of decency that mark the progress of a maturing society.'" *Id*. at 259 (quoting *Graham v. Florida*, 560 U.S. 48, 58 (2010)). For example, in the intervening years since *Boddie*, "all but two states [have] criminalize[d] sexual conduct between inmates and corrections officers," so that these "legislative enactments are the 'clearest and most reliable objective evidence of contemporary values.'" *Id.* at 260 (quoting *Atkins v. Virginia*, 536 U.S. 304, 315 (2002)). Such consistency in the direction of change in the law reflects society's "deep moral indignation" regarding sexual abuse of prisoners. *Id.* (citation and internal quotation marks omitted).

Despite the evolving standards of decency regarding sexual abuse, the facts alleged by Abrams do not rise to the level of being "repugnant to the conscience of mankind" so do not constitute a constitutional harm under either *Boddie* or *Crawford*. Unlike in *Crawford*, there has been no alleged sexually suggestive or any other kind of physical contact between Trapp and the Plaintiff. Rather, Abrams alleges that Trapp gave him soap and envelopes, watched him work out in his gym shorts, observed him through his cell window, smiled at him during times of partial privacy (as he carried out acts of hygiene), and on at least two occasions, posed in allegedly

seductive or provocative manners in Abrams's presence. None of these incidents was "severe" enough to be deemed "objectively, sufficiently serious."

In particular, Plaintiff has alleged that Trapp watched him work out while wearing only his gym shorts. Doc. 1, ¶17. At such times, she allegedly smiled at him, giving the "thumbs-up" signal of approval. *Id.* Trapp also allegedly "would stop by [Abrams's] cell while his cell window was partially covered for privacy" and watch him "urinate, masturbate, and wash up while [he was] fully naked" after working out. *Id.*, ¶18. According to Plaintiff, on one occasion, a shadow went by his cell window when he was "manscaping," standing naked before his toilet, but he was unable to identify the shadow. *Id.*, ¶¶ 35-42.

In addition, Plaintiff claims that Trapp posed suggestively in front of him on a number of occasions – bending over with her back to Plaintiff, sitting with her legs apart, and exposing her cleavage by wearing loose, low-cut blouse. In Plaintiff's words, Trapp would "bend over at the waist," "spread her legs while seated in front of him," and/or "lean forward with her loose-fitted, low-cut blouse" exposing her cleavage. *Id.,* ¶¶ 24-26. At such times, rather than being traumatized, humiliated or sexually aroused by such conduct, Abrams states that he "would laugh to himself" because he "found her unattractive" due to her "masculine, Caitlin Jenner-like features" and child-like build. *Id.*, ¶¶ 20, 25.

Construing the facts liberally, accepting Plaintiff's allegations as true, the Court finds that Trapp's actions – viewing Abrams in his cell during her rounds and posing provocatively – do not rise to the level of sexual abuse. Granted, such actions might potentially be viewed as unprofessional, inappropriate, and/or offensive. However, being observed by a guard during rounds while an inmate is in semi-privacy, receiving a thumbs up or a smile, and/or being forced to witness

a comical display of provocative poses (causing admitted laughter, rather than suffering) are not events which are "objectively harmful enough or sufficiently serious" to reach constitutional dimensions.[4] *Crawford*, 796 F.3d at 257 *See also Boddie*, 105 F.3d at 861.

To constitute a constitutional violation, there must be "severe or repetitive sexual abuse" which is "cumulatively egregious," *Boddie*, 105 F.3d at 861, or conduct which is "repugnant to the conscience of mankind" such that it is "incompatible with evolving standards of decency," *Crawford*, 796 F.3d at 257.[5] *See also Keaton v. Ponte*, No. 16 CIV. 3063 (KPF), 2017 WL 3382314, at *10 (S.D.N.Y. Aug. 4, 2017) (dismissing prisoner's Eighth Amendment claims of sexual abuse against female corrections officers where there was no "illicit physical contact between a corrections officer and an inmate" and the corrections officers' alleged "verbal harassment," encouraging the inmate to use the shower, watching him shower, and making sexual gestures with lipsticks and tongues, "without more, [were] not actionable" as cruel and unusual punishment in violation of the Eight Amendment).

Moreover, a valid penological interest in the officer's conduct militates against a finding of sexual abuse. *See, e.g., Grant v. Norfleett*, No. 3:17-CV-328 (AWT), 2017 WL 1902150, at *3 (D. Conn. May 9, 2017) (Plaintiff's complaint failed to state a plausible Eight Amendment sexual abuse

---

[4] The Court also notes that Plaintiff's Eighth Amendment sexual abuse claims failed to allege that Trapp had a "sufficiently culpable state of mind," characterized by "wantonness" in light of "the particular circumstances surrounding the challenged conduct." *Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016) (quoting *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009)). In other words, Plaintiff's claim contained no facts to establish that her actions were done wantonly, maliciously, or sadistically. *Id.*

[5] *Cf. Brown v. Semple*, No. 3:17-CV-1328 (SRU), 2017 WL 4050308, at *3 (D. Conn. Sept. 13, 2017) (Eighth Amendment sexual abuse claim allowed to proceed pursuant to IRO where prisoner alleged that prison mental health therapist "repeatedly subjected him to inappropriate touching, oral sex, and vaginal sex during their mental health therapy sessions").

claim against defendants who allegedly subjected him to a body cavity search "for their own sexual gratification" – "watch[ing] him like a piece of meat" – where search occurred during prisoner's transfer to a restrictive housing unit after he engaged in a fight with his cellmate). Trapp allegedly made her observations of Abrams during her rounds as a guard at Corrigan. Observing prisoners through their cell windows is incidental to one's official and necessary duties as a prison guard.

In sum, Plaintiff has alleged no "cumulatively egregious" or sufficiently "repugnant" conduct by Trapp in this case.[6] Accordingly, Plaintiff's allegations fail to state a plausible claim against Trapp for Eighth Amendment sexual abuse. His first claim will be dismissed.

## B.  Retaliation

In addition to sexual abuse, Abrams claims that Trapp retaliated against him by filing a false disciplinary report after he stopped communicating with her. Doc. 1 (Complaint), ¶¶70-74, 90-91. He alleges that Trapp's disciplinary report violated his Fifth, Eighth, and Fourteenth Amendment rights. However, a prisoner's claim that a prison official retaliated against his speech or expressive conduct is typically analyzed under the First Amendment. Construing Plaintiff's claim liberally in

---

[6] Despite claiming he was offended by Trapp viewing him through his cell window, Plaintiff provides no facts to establish why he did not react to preserve his modesty. For example, he failed to dress in his clothes or cease to engage in private hygiene, grooming, *etc.* while Trapp remained present. *Cf. Willey v. Kirkpatrick*, 801 F.3d 51, 57 (2d Cir. 2015) (prisoner attempted suicide after being harassed in solitary confinement, where corrections officer was accused of watching the prisoner shower while "licking his lips and blowing kisses toward him"). Furthermore, on the occasion when Abrams alleges he was grooming himself while naked, he admits that he was not even able to discern who had walked past his cell window or for what purpose. He only alleges that a shadow had passed and he assumed it had been Trapp because her office was in darkness with her door locked. Doc. 1, ¶¶ 32, 39-42. Even assuming that Trapp was the person at Plaintiff's cell window, a prison guard inspecting a cell with a partially-covered window during lockdown shows neither patent malicious intent nor objectively repugnant behavior. There is a valid penological interest in a guard walking the hallways and observing prisoners during a lockdown due to the governor's presence.

light of his *pro se* status, the Court will construe it as First Amendment retaliation claim.

"Prison officials may not retaliate against inmates for exercising their constitutional rights." *Riddick v. Arnone*, No. 11 Civ. 631 (SRU) 2012 WL 2716355 *6 (D. Conn. July 9, 2012) (citing *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)). "To prevail on a First Amendment retaliation claim, [a prisoner] must establish (1) that the speech or conduct at issue was protected, (2) that the [official] took adverse action against the [prisoner], and (3) that there was a causal connection between the protected [conduct] and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (internal quotation marks omitted). *See also Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)(same). The prisoner bears the burden of showing that "the protected conduct was a substantial and motivating factor in the prison officials' disciplinary decision." *Holland*, 758 F.3d at 225 (internal quotation marks omitted).

In the instant case, Abrams alleges that after he stopped communicating with Trapp on or around March 3, 2017, she issued a disciplinary report against him ten days later. Doc. 1, ¶¶ 71-74. The report stated that "[a] review of the unit logbook confirm[ed] and acknowledge[d]" that Trapp had announced that there would be a "female in unit;" however, Plaintiff, knowing that she was there, "was observed in his boxers with his penis showing through the slit," thereby "intentionally exposing himself" to her. Doc. 1, at 30 ("Disciplinary Report," dated 3/13/2017). The report concludes that "[t]he DHO [Disciplinary Hearing Officer] found the inmate guilty at the hearing based on the evidence, staff observation, and documentation submitted." *Id.* On March 29,2017, hearing officer Lieutenant King sanctioned Abrams "to deter future misconduct." *Id.*

Nothing in the report or its investigation suggests a link between any protected speech or conduct by Plaintiff and the disciplinary report. The argument Plaintiff allegedly had with Trapp was

"over his placement at the bottom of the list for industry jobs that pay up to $150 monthly." Doc. 1, ¶ 71. The argument had no bearing on Trapp's alleged "sexual abuse and invasion of privacy" of Plaintiff. *Id.*, ¶ 70. "Cases supporting retaliation claims for inmate statements concern actions taken in response to the inmate filing a grievance, instituting a lawsuit or making a complaint to prison officials regarding the conduct of correctional staff." *Riddick*, 2012 WL 2716355, at *7 (citing *Ramsey v. Goord*, 661 F.Supp.2d 370 (W.D.N.Y.2009)). Any complaints that Plaintiff made regarding Trapp's conduct were made after her disciplinary report, not before it. Doc. 1, ¶¶ 50-51. Therefore, there are no indications that the alleged argument involved any protected speech.

Furthermore, "[w]ith regard to false misbehavior reports, the type of evidence required to establish a causal connection between the plaintiff's protected conduct and the alleged retaliation include temporal proximity, prior good discipline, a finding of not guilty at the disciplinary hearing and statements from the defendants regarding their motives." *See Barclay v. New York*, 477 F.Supp.2d 546, 558 (N.D.N.Y. 2007). In this case, the report against Abrams was made more than a week after his alleged fight with Trapp; Abrams was found guilty at the disciplinary hearing, and there are no statements by Trapp to suggest she had a retaliatory motive in filing the report. In sum, Plaintiff has failed to sufficiently allege that he engaged in protected speech causally connected to the disciplinary report. He has also failed to allege facts to show that the report was false and/or motivated by retaliation.

Because "claims of retaliation are easily fabricated," courts must consider them "with skepticism and require that they be supported by specific facts." *Riddick*, 2012 WL 2716355 *6. Conclusory statements will not suffice. *See, e.g., Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir.2003). Rather, "the plaintiff must allege both that a defendant filed the [false misbehavior] report

and that his motivation to do so relates to the plaintiff having engaged in protected activity." *Riddick*, 2012 WL 2716355 *6 (citing *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988)). Abrams has failed to allege protected speech or state facts to establish a causal connection to the disciplinary report. He has failed to state a plausible First Amendment retaliation claim against Trapp.[7]

## C. **Intrusive Strip Search**

### 1. **Fourth Amendment Claim**

Abrams claims that Peterson, Watson, and Erfe violated his Fourth and Eighth Amendment rights by subjecting him to an intrusive body cavity search in conjunction with his transfer to the segregation unit on March 13, 2017. Doc. 1, ¶¶69, 92-93. He alleges that such a search was performed at the time he was "placed in the segregation unit pending investigation for indecent exposure." *Id.* ¶ 69.

The Fourth Amendment protects prisoners against overly intrusive body cavity searches. *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016). "Courts assessing [a prisoner's] claim that officers infringed his or her right to bodily privacy must undertake a two-part inquiry: (1) First, the court must determine whether the [prisoner] has exhibit[ed] an actual, subjective expectation of bodily privacy; and (2) second, the court must determine whether the prison officials had sufficient justification to intrude on [the prisoner's] [F]ourth [A]mendment rights." *Id.* (internal quotations omitted).

---

[7] In his prayer for relief, Plaintiff seeks an injunction mandating that Warden Erfe expunge the disciplinary report. Doc. 1, at 24 ("Relief Requested"), ¶ C.1. Plaintiff may thus also intend to sue Erfe with respect to what he deems a retaliatory and false report. Although personal involvement of an official sued in his official capacity is not necessary where the prisoner is seeking injunctive relief, *Davidson v. Scully*, 148 F. Supp.2d 249, 254 (S.D.N.Y. 2001), Abrams has failed to state a plausible claim of retaliation against any defendant in this case. His claim for injunctive relief against Erfe is dismissed.

### a. **Peterson**

Here, Abrams states that the strip search was ordered when he was placed in the segregation unit pending investigation of the indecent exposure charge contained in his disciplinary report. With respect to the particular search at issue, he does not state a challenge to the policy of the search with respect to defendant Peterson, but complains that it occurred "in front of defendant Peterson (a female) and other officers." Doc. 1, ¶ 69.

There is no dispute that "[a] strip search that involves a stranger peering without consent at a naked individual, and in particular at the most private portions of that person's body, is a serious invasion of privacy." *Harris*, 818 F.3d at 58 (citation and internal quotation marks omitted). Furthermore, "[a]lthough, generally, the strip search of a male inmate in view of a female correction officer does not, by itself, rise to the level of a constitutional violation, strip searches conducted by members of the opposite sex constitute a heightened invasion of privacy in this Circuit and are thus subject to higher scrutiny than those conducted by members of the same sex." *Holland v. City of New York*, 197 F. Supp. 3d 529, 543 (S.D.N.Y. 2016) (citations omitted). *See also Forts v. Ward*, 621 F.2d 1210, 1217 (2d Cir.1980) ("The privacy interest entitled to protection concerns the involuntary viewing of private parts of the body by members of the opposite sex."); *see also Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994)("[W]hile all forced observations or inspections of the naked body implicate a privacy concern, it is generally considered a greater invasion to have one's naked body viewed by a member of the opposite sex."); *York v. Story*, 324 F.2d 450, 455 (9th Cir.1963) ("The desire to shield one's unclothed figure from views of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity.").

"Recognizing that a strip search by an officer of the opposite sex involves a heightened invasion of privacy, courts in this Circuit have distinguished between 'regular' and 'close' viewing and 'incidental' and 'brief viewing of a naked prisoner,' with the latter being found constitutional." *Holland*, 197 F. Supp. 3d at 543 (S.D.N.Y. 2016) (quoting *Little*, 2014 WL 4783006, at *2, and collecting cases). For example, in *Correction Officers Benevolent Association v. Kralik*, No. 04 Civ. 2199, 2011 WL 1236135, at *11 (S.D.N.Y. Mar. 30, 2011), the court noted that "[m]ore recent cases in this Circuit and elsewhere addressing inmates' right to privacy suggest that occasional, indirect, or brief viewing of a naked prisoner by a guard of the opposite sex may be permissible, but that 'regular and close viewing' is prohibited." *See also Baker v. Welch*, No. 03 Civ. 2267, 2003 WL 22901051, at *20 (S.D.N.Y. Dec. 10, 2003) ("[T]he balance should be struck to allow incidental and obscured viewing but prohibit regular and close viewing."); *Miles v. Bell*, 621 F.Supp. 51, 67 (D.Conn.1985) (explaining that the Second Circuit's opinion in *Forts v. Ward* "merely emphasizes that in order for inmates to show a violation of their privacy rights, they must show that the 'viewing' by guards of the opposite sex occurs on a regular basis" and distinguishing *Forts* from situations wherein "female guards ... only occasionally view[ ] male inmates undressed or using the shower and toilet facilities").

As the court stated in *Holland,* however, its reading of these cases, focusing on the opposite sex guards' regularity of viewing the prisoners' bodies, does not "preclude the possibility . . . that a single search may also violate an inmate's right to privacy." 197 F.Supp. 3d at 543-44 (citing *Hayes v. Marriott*, 70 F.3d 1144, 1145, 1147 (10th Cir.1995)).[8] Furthermore, the Second Circuit has

---

[8] In *Hayes*, the Tenth Circuit reversed dismissal of the complaint where male inmate alleged "that he was subjected to a body cavity search in the presence of over 100 people, including female secretaries and case managers." 70 F.3d at 1145. The court recognized that "[a]lthough [it had]

stated that "cross-gender strip searches of inmates conducted in the absence of an emergency or other exigent circumstances are generally frowned upon." *Harris*, 818 F.3d at 63 (citing *Moore v. Carwell*, 168 F.3d 234, 237 (5th Cir.1999); *Hayes,* 70 F.3d at 1146; *Canedy*, 16 F.3d at 187; and *Lee v. Downs* , 641 F.2d 1117, 1119 (4ᵗʰ Cir. 1981)).

In the case at bar, Abrams has alleged that he was strip searched as part of his transfer to the segregation unit. He also states that the search took place in front of Peterson, a female officer. Specifically, he states that he "was ordered to strip and bend at the waist and spread his butt cheeks in front of defendant Peterson (a female) and other officers." Doc. 1, ¶ 69. Although the governor was visiting Cheshire C.I. at the time, causing the facility to be on lockdown, there is no evidence that there was an emergency or that exigent circumstances existed.

Pursuant to administrative prison policy, the rule that "an inmate be strip-searched when he or she is placed in either administrative segregation or a restrictive housing unit is reasonable and valid." *Holloway v. Dep't of Corr.*, No. 3:11-CV-1290 (VLB), 2013 WL 4834657, at *5 (D. Conn. Sept. 10, 2013) (citing State of Connecticut Administrative Directive 6.7 ("Searches Conducted in Correctional Facilities"), at § 5(A)).[9] However, in this case, the presence of a corrections officer of the opposite sex requires heightened concerns regarding privacy.

---

stated that the frequency with which prison guards watch inmates of the opposite sex undressing, using toilet facilities, and showering is an important factor in assessing the constitutionality of prison practices,[it had] also concluded that a prisoner's right to privacy may be violated by a single search." *Id.* at 1147 (citations omitted)).

[9] Pursuant to this provision, a strip-search of an inmate must be conducted "upon initial placement in a specialized housing unit, to include ... administrative segregation ... [and] restrictive housing." Admin. Directive 6.7(5)(A)(6)(a) and (h).

Reading the *pro se* prisoner's complaint liberally, assuming the truth of its allegations and "interpret[ing] his complaint to raise the strongest arguments it suggests," *Abbas*, 480 F.3d at 639, the search took place "directly in front of" an opposite-sex guard – in a manner that was not "indirect," "incidental," or brief" – without a pending emergency or exigent circumstances, such as a violent disturbance. Such a direct and close view of an inmate's body during a search by an opposite sex guard may plausibly give rise to a Fourth Amendment claim for invasion of privacy. Plaintiff's claim may therefore proceed against Officer Peterson, in her individual capacity, at this time.

### b. Captain Watson and Warden Erfe

To the extent that Plaintiff may wish to pursue claims for an unconstitutional policy regarding strip searches of prisoners placed in segregation, such challenges to a prison regulation or policy are analyzed under the four-factor test in *Turner v. Safley*, 482 U.S. 78 (1987). *See, e.g.*, *Harris*, 818 F.3d at 57. "Under *Turner*, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 57-58. This involves the following four factors:

[(1)] whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; [(2)] whether there are alternative means of exercising the right in question that remain open to [prisoners]; [(3)] whether accommodation of the asserted constitutional right will have an unreasonable impact upon guards or other [prisoners], and upon the allocation of prison resources generally; and [(4)] whether there are reasonable alternatives available to the prison authorities.

*Covino v. Patrissi*, 967 F.2d 73, 78-79 (2d Cir. 1992). It is the prisoner's burden to show that the challenged prison regulation is unreasonable. *Id.* at 79.

The Supreme Court has recognized that "correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities."

*Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 328, 344-45 (2012). For example, "courts in this District have uniformly held, in light of the Supreme Court's decision in *Florence*, that '[t]he general practice of strip searching a detainee during housing searches and on the way to and from court appearances is not unconstitutional, even if the detainee is accused only of a misdemeanor.'" *Keaton v. Ponte*, No. 16 CIV. 3063 (KPF), 2017 WL 3382314, at *12 (S.D.N.Y. Aug. 4, 2017) (citing *Thompson v. City of N.Y.*, No. 16 Civ. 824 (PKC), 2017 WL 1929552, at *2 (S.D.N.Y. May 9, 2017) (collecting cases)). *See also Perkins v. City of New York.*, No. 14 Civ. 3779 (WHP), 2017 WL 1025987, at *2 (S.D.N.Y. Mar. 15, 2017) ("Strip searches are permissible provided that the search is tied to legitimate security interests, a determination that is peculiarly within the province and professional expertise of correctional officers. . . . And random strip searches may be conducted even in detainees' housing units.") (citations and internal quotation marks omitted); *Myers v. City of New York*, No. 11 CIV. 8525 (PAE), 2012 WL 3776707, at *9 (S.D.N.Y. Aug. 29, 2012) ("[U]nder the standard outlined in *Florence*, the searches to which [plaintiff] was subjected were "reasonably related to legitimate security interests," including preventing the smuggling of contraband into or out of [the jail in which plaintiff was confined].") (quoting *Florence*, 566 U.S. at 326), *aff'd*, 529 F. App'x 105 (2d Cir. 2013).

In the case at bar, the pertinent Connecticut regulation requires a strip search upon a prisoner's placement in specialized housing. *See* State of Connecticut Administrative Directive 6.7 ("Searches Conducted in Correctional Facilities"), at § 5(A)). That regulation is valid because it is "reasonably related to legitimate penological interests" – ensuring that no weapon or contraband item is being transported when a prisoner is transferred into the specialized housing unit. *See, e.g., Holloway,* 2013 WL 4834657, at *5 ("The parties do not contest the fact that subsection 5(A) of

Administrative Directive 6.7 which requires that an inmate be strip-searched when he or she is placed in either administrative segregation or a restrictive housing unit is reasonable and valid.").

Plaintiff, who bears the burden to show that such a regulation is unreasonable, has failed to present facts or circumstances to challenge this safety policy. Absent allegations of sufficient grounds that the policy is unreasonable, Plaintiff's Fourth Amendment claims against Watson and Erfe are dismissed.

### 2. **Eighth Amendment**

Abrams's allegations regarding an intrusive strip search do not state an Eighth Amendment claim against any defendant. The Second Circuit has held that a prisoner's claim that he was subjected to an unreasonably intrusive strip or cavity search for purposes of the prison official's sexual gratification may constitute a cognizable § 1983 claim. *See Crawford v. Cuomo*, 796 F.3d 252, 258 (2d Cir. 2015) ("[A] search may not be undertaken maliciously or for the purposes of sexually abusing [a prisoner]"). *See also Bell v. Wolfish*, 441 U.S. 520, 560 (1979) (body cavity searches of prisoners must be reasonable in scope). Here, however, Abrams fails to allege that the search was conducted for the prison officials' sexual gratification or some other harmful purpose. He simply objects to the search occurring "in front of defendant Peterson (a female) and other officers." Doc. 1, ¶69. Absent prison officials' motive of sexual gratification or harm, Plaintiff's Eighth Amendment claim against Peterson, Watson, and Erfe regarding the strip search must be dismissed.

### D.  **Placement in Segregation - Deprivation of Liberty**

Abrams argues that Trapp violated his Fourteenth Amendment right to due process by causing him to be placed in the segregation unit for seventeen days, which resulted in a ten-day loss

of good time credit. Doc. 1, ¶79. In particular, Plaintiff claims that he was "placed in segregation on March 13- March 29, 2017 as a result of Trapp's disciplinary report that falsely accused him of intentionally exposing himself to her . . ." *Id.*

In *Sandin v. Conner*, 515 U.S. 472, 486 (1995), the Supreme Court expressly held that a state prisoner who is subjected to disciplinary punishment that is within the prisoner's expected condition of confinement cannot establish deprivation of a protected liberty interest. Only disciplinary actions which impose an "atypical and significant hardship in relation to the ordinary incidents of prison life" may constitute a constitutional deprivation. *Id.* at 484.

In *Sandin*, the prisoner brought a § 1983 action against several prison officials alleging that they had violated his constitutional right to procedural due process by sentencing him to disciplinary segregation without permitting him to call certain witnesses. *Id.* at 476. The Supreme Court rejected the contention that any action taken by correctional officials as a punitive measure necessarily encroaches upon a liberty interest protected under the Due Process Clause. *Id.* at 484. Moreover, as to time limits for disciplinary confinement, the Supreme Court held that a prisoner who was subjected to a disciplinary term of thirty days of confinement in restrictive housing did not sustain a deprivation of a liberty interest in violation of the Fourteenth Amendment's Due Process Clause. *Id.* Given the prisoner's indeterminate sentence of 30 years to life, his confinement in disciplinary segregation for 30 days "did not exceed similar, but totally discretionary confinement in either duration or degree of restriction." *Id.* at 486. The Supreme Court concluded that such confinement did not constitute an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" inasmuch as "[t]he regime to which [the prisoner] was subjected . . . was

within the range of confinement to be normally expected for one serving an indeterminate term of 30 years to life." *Id.* at 484, 486-87.

In the case at bar, Abrams's seventeen-day confinement in segregation, falling well short of thirty days, does not, in and of itself, constitute a sufficient deprivation of liberty subject to due process protection. This seventeen (17) day restriction imposes no "atypical and significant hardship" in relation to the fifty-one (51) year term of imprisonment to which Abrams was sentenced for attempted murder, assault, and criminal possession of a firearm under Conn. Gen. Stat. §§ 53a-49, 53a-54a(a), 53a-59(a)(1), 53a-217. *See State v. Abrams*, No. DBDCR00110691, 2013 WL 6038339, at *1 (Conn. Super. Ct. Oct. 24, 2013) (discussing conviction at docket no. CR00–110691).

As to Trapp's allegedly false disciplinary report, "[i]n general, a 'prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.'" *Willey v. Kirkpatrick*, 801 F.3d 51, 63 (2d Cir. 2015) (quoting *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir.1986)). There are, however, "two exceptions to this rule: when an inmate is able to show either (1) that he was disciplined without adequate due process as a result of the report; or (2) that the report was issued in retaliation for exercising a constitutionally protected right." *Id.* (citation and internal quotation marks omitted).

In the case at bar, Plaintiff has failed to establish that either exception applies. First, he was disciplined regarding Trapp's disciplinary report only after he received an evidentiary hearing before a hearing officer. Second, he has failed to adequately allege that the report was issued in retaliation for exercising a constitutionally protected right. Under these circumstances, he has failed to state a plausible claim for violation of his due process rights relating to time spent in segregation.

Granted, a loss of liberty interest is created when a prisoner loses good time credit. *See Abed v. Armstrong*, 43 Conn. App. 176, 181-82 (1996). However, with respect to an inmate being charged with an offense that would deprive him of such credit, it is well settled that the inmate is entitled only to the minimum procedures appropriate to insure that his due process rights are not arbitrarily abrogated. *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). In general, in this context, "some kind of hearing is required." *Id.* at 557.

In the case at bar, Plaintiff's claim does not challenge the nature of the disciplinary hearing that took place. According to "Disciplinary Report" (dated 3/13/2017) Plaintiff attached to his Complaint, "[t]he DHO [Disciplinary Hearing Officer] found the inmate guilty at the hearing based on the evidence, staff observation, and documentation submitted." Doc. 1, at 34. On the facts pled, Abrams received the minimum procedures appropriate to insure that his due process rights were not violated. Put simply, at the conclusion of an evidentiary hearing, he was found guilty by the hearing examiner. On March 29, 2017, hearing officer Lieutenant King sanctioned Abrams "to deter future misconduct" and "advised [him] of the appeal process." *Id.* Plaintiff's current bald allegations that Trapp falsified her report are insufficient to plausibly state a due process claim. Plaintiff had the opportunity to challenge her report at the hearing. His due process claim regarding his placement in segregation is dismissed.

## E.     Hazardous Conditions of Confinement in Segregation

Abrams claims that Watson, Erfe, and Doe violated his Eighth Amendment rights by subjecting him to, and dismissing his complaints about, black mold on his cell vent in the segregation unit where was he housed for seventeen days. Doc. 1, ¶¶75, 94-97. The Eighth Amendment, which applies to the States through the Due Process Clause of the Fourteenth

Amendment, prohibits the infliction of "cruel and unusual punishments" on those convicted of crimes. *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991).

"Under both the Eighth and Fourteenth Amendments, to establish an objective deprivation, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health, which includes the risk of serious damage to physical and mental soundness." *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (citations and internal quotation marks omitted). "There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.'" *Id.* (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995)). The Second Circuit has clarified that the alleged "unsanitary conditions of confinement must be assessed according to two components, severity and duration, on a case-by-case basis." *Darnell*, 849 F.3d at 30 (discussing *Willey v. Kirkpatrick*, 801 F.3d 51, 66-68 (2d Cir. 2015)).

Moreover, the second element of a conditions of confinement claim includes proving the defendant's "deliberate indifference" to the objectively serious condition. *See Wilson*, 501 U.S. at 303 (holding it is "appropriate to apply 'deliberate indifference' standard articulated in *Estelle* [*v. Gamble*, 429 U.S. 97 (1976) ]" to cases of "inhumane conditions of confinement, failure to attend to [a prisoner's] medical needs, or a combination of both").

In sum, a prisoner may prevail on an Eighth Amendment claim based on unconstitutional conditions of confinement if he is able to prove (1) an objectively unreasonable risk of serious damage to his health, *Darnell*, 849 F.3d at 30, and (2) "deliberate indifference," a subjectively culpable sate of mind on the part of the prison officials, *Wilson*, 501 U.S. at 303. *See also Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) ("To state an Eighth Amendment claim based on

conditions of confinement, an inmate must allege that: (1) objectively, the deprivation the inmate suffered was 'sufficiently serious that he was denied the minimal civilized measure of life's necessities,' and (2) subjectively, the defendant official acted with 'a sufficiently culpable state of mind . . ., such as deliberate indifference to inmate health or safety.'") (quoting *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)).

In the case at bar, to state an Eighth Amendment claim for unconstitutionally hazardous conditions of his confinement, Abrams must allege facts demonstrating that the condition, in this case black mold, in his cell posed an unreasonable risk of serious damage to his health and that Watson, Erfe, and/or Doe were deliberately indifferent to said condition. In particular, Abrams must allege the existence of the mold on his cell vent constituted an objectively serious condition – one that "'pose[d] an unreasonable risk of serious damage to [his] future health.'" *Phelps*, 308 F.3d at 185 (quoting *Helling v. McKinney*, 509 U.S. 25, 35 (1993)). *See also Davidson v. Flynn*, 32 F.3d 27, 29 (2d Cir. 1994) (This "objective component relates to the seriousness of the injury.").

In addition, to meet the subjective component, Abrams must allege that the Watson, Erfe and Doe knew "of and disregard[ed] an excessive risk to [his] health or safety," that is, that each was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and … dr[e]w that inference." *Phelps*, 308 F.3d at 185-86.

In his Complaint, Abrams has alleged the presence of the hazardous condition of "black mold" on the air vent in his segregation cell. In general, mold has been recognized as a factor which may pose an unreasonable risk of damage to a prisoner's health. *Smith v. Leonard*, 244 F. App'x 583, 584 (5th Cir. 2007) ("To the extent Smith's gross negligence claim is liberally construed to allege an Eighth Amendment claim of cruel and unusual punishment, he has alleged facts sufficient to

preclude a determination that his mold claim is frivolous or fails to state a claim."); *Davis v. Williams*, 216 F. Supp. 3d 900, 904 (N.D. Ill. 2016) (Plaintiff pled "sufficiently serious [non]hygienic conditions to survive a motion to dismiss" where he alleged, *inter alia*, that he lacked cleaning supplies so "his cell and shower area [could] not be adequately cleaned and that the resultant toxic mold [could] result in neurological damage and cancer.").

Furthermore, courts in this District have repeatedly found mold to pose a substantial risk of danger to a prisoner's health. *See, e.g., Barney v. Semple*, No. 3:17-CV-685 (AWT), 2017 WL 2380165, at *2 (D. Conn. May 31, 2017) ("The court concludes that the alleged conditions are sufficient to support a plausible claim for unconstitutional conditions of confinement" where plaintiff alleged, *inter alia*, that he was exposed to "black and yellow mold" in the Q-building, where he was housed.); *Wade v. Chapdelaine*, 17 Civ. 350 (JAM), 2017 WL 1479417, *2 (D. Conn. Apr. 24, 2017) ("[Prisoner] Plaintiff's complaint sufficiently alleges an objectively substantial risk of serious harm because of his exposure to friable asbestos and mold."); *Toliver v. Comm'r Semple*, 16 Civ. 1899 (SRU), 2016 WL 7115942, *2 (D. Conn. Dec. 6, 2016) (The court "conclude[d] that the alleged conditions [were] sufficient to support a plausible claim for unconstitutional conditions of confinement" where one such condition was the presence of "black and yellow mold.").

With respect to a culpable state of mind, Plaintiff alleges that Watson dismissed his complaint about black mold in the segregation unit by telling him, "It comes off with wet tissue." Doc. 1, ¶57. Because exposure to mold may pose a serious health risk and Watson's response exhibits "deliberate indifference" to, or blatant disregard for, Abrams's health and safety, the Court will permit Abrams's Eighth Amendment claim to proceed against Watson in his individual capacity.

In contrast, as to the other two defendants at issue, Warden Erfe and Maintenance Supervisor Doe, Plaintiff has presented no facts to support that they had knowledge of the mold and/or were deliberately indifferent to its presence. "It is well settled . . . that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation marks omitted); *see also Johnson v. Glick*, 481 F.2d 1028, 1034 (2d Cir. 1973) (doctrine of *respondeat superior* does not suffice for claim of monetary damages under § 1983). A prisoner who sues a supervisory official in his individual capacity for monetary damages must allege that the official was "personally involved" in the constitutional deprivation in one of four ways: (1) the official directly participated in the deprivation; (2) the official learned about the deprivation through a report or appeal and failed to remedy the wrong; (3) the official created or perpetuated a policy or custom under which unconstitutional practices occurred; or (4) the official was grossly negligent in managing subordinates who caused the unlawful condition or event. *Wright*, 21 F.3d at 501. *See also Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003).

"In addition, supervisory liability may be imposed where an official demonstrates gross negligence or deliberate indifference to the constitutional rights of [prisoners] by failing to act on information indicating that unconstitutional practices are taking place." *Wright*, 21 F.3d at 501. To state a claim against a supervisory official, the plaintiff must allege a causal link between the conduct of the supervisory official, or lack thereof, and the injury. *See Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002).

Here, Abrams fails to allege facts to establish that either Erfe or Doe were involved in, or even aware of, the black mold in the segregation unit. *See Merriwether v. Coughlin*, 879 F.2d 1037,

1048 (2d Cir. 1989) (to impose supervisory liability prisoner must allege that official had actual or constructive notice of unconstitutional practices and demonstrated gross negligence or deliberate indifference by failing to act). Abrams included them as defendants due to their supervisory roles at Cheshire C.I. However, their positions alone are insufficient to allege personal involvement in a constitutional violation. *See, e.g., Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985) (claim for monetary damages against Commissioner of Correction requires greater showing than linkage in prison chain of command); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977) (fact that commissioner was in high position of authority insufficient basis for personal liability). Because Plaintiff has failed to allege sufficient facts to establish "deliberate indifference" to the hazardous condition of mold in the segregation unit, his Eighth Amendment "hazardous condition" claim is dismissed as to Erfe and Doe.

## F.     Interference with PREA Investigation

Abrams raises a number of constitutional claims against Peterson and Watson for their interference with his ability to investigate and pursue a "PREA claim." Doc. 1, ¶¶80-84, 98, 100-01. Specifically, he argues that Peterson failed to investigate his PREA claims against Trapp and that Watson dismissed his claims as having no merit. Abrams contends that these actions constituted a violation of the Fourteenth Amendment's due process and equal protection clauses. Based on the Court's liberal reading of the allegations, Abrams is attempting to state a claim against Peterson and Watson for denial of access to courts.

"Prisoners have a constitutional right of access to the courts that may not be unreasonably obstructed by the actions of prison officials." *Baker v. Weir*, No. 16 Civ. 1066 (JAM), 2016 WL 7441064, *2 (D. Conn. Dec. 27, 2016) (citing *Washington v. James*, 782 F.2d 1134, 1138 (2d Cir.

31

1986)).  The prisoner's right of access to courts is rooted in the constitutional guarantees of equal protection of laws and due process.  *Avent v. New York*, 157 F. App'x 375, 377 (2d Cir. 2005).  "[T]o state a claim for denial of access to the courts, a [prisoner] must demonstrate that he suffered an actual injury . . . that is, he must allege that [the officials'] conduct deprived him of an opportunity to press some nonfrivolous, arguable cause of action in court."  *Baker*, 2016 WL 7441064, *2.  "The [prisoner] must allege not only that the [official's] alleged conduct was deliberate and malicious, but also that the [official's] actions resulted in actual injury to the [prisoner] such as the dismissal of an otherwise meritorious legal claim."  *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) (quoting *Cancel v. Goord*, No. 00 Civ. 2042 (LMM), 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001)).  "[T]he injury requirement is not satisfied by just any type of frustrated legal claim."  *Lewis v. Casey*, 518 U.S. 343, 354 (1996).  The underlying claim must involve a challenge to the conviction for which the prisoner was incarcerated, an action under 42 U.S.C. § 1983, or some other form of challenge to the prisoner's sentence or conditions of confinement.  *Id.* at 354-55.

Abrams cannot state a plausible "denial of access to courts claim" against Peterson or Watson.  He claims that Peterson failed to investigate his PREA claims and that Watson dismissed them as lacking merit.  However, "[t]he law is well established that a failure to process, investigate or respond to a prisoner's grievances does not in itself give rise to a constitutional claim."  *Dorlette v. Butkiewicus*, 11 Civ. 1461 (TLM), 2013 WL 4760943, *22 (D. Conn. Sep. 4, 2013) (internal quotations omitted).  Moreover, even if he could show that Peterson and Watson somehow prevented him from pursuing a PREA claim, he cannot show that he suffered any actual injury.  The "PREA does not create a private right of action for [prisoners] . . . ."  *White v. Doe*, 16 Civ. 1874 (JAM), 2017 WL 2562845, *5 (D. Conn. Jun. 13, 2017).  *See also Jones v. Forbes*, No. 3:16CV14 (VAB),

2016 WL 4435081, at *3 (D. Conn. Aug. 19, 2016) ("There is nothing in the PREA that suggests that Congress intended to create a private right of action for inmates to sue prison officials for non-compliance with the Act."); *Chao v. Ballista*, 772 F. Supp. 2d 337, 341 n.2 (D. Mass. 2011) (noting that "every court to address the issue" has held that the PREA does not provide a private cause of action) (collecting cases); *Chinnici v. Edwards*, No. 1:07-cv-229, 2008 WL 3851294, at *3 (D. Vt. Aug. 12, 2008) ("[T]he PREA confers no private right of action," but is rather "intended to address the problem of rape in prison, authorizes grant money, and creates a commission to study the issue. The statute does not grant prisoners any specific rights.") (citation omitted). Accordingly, all claims against Watson and Peterson regarding their interference with Abrams's PREA investigation will be dismissed.

## G.   <u>State Law Claims</u>

In addition to his constitutional claims, Abrams has raised the following state law claims: (1) negligence against Trapp for sexually harassing Abrams; (2) slander against Trapp for filing a false disciplinary report; (3) negligence against Watson and Erfe for "failure to maintain hazard free living conditions in segregation" (regarding "the black mold on the vents" in the segregation unit); and (4) negligence against Peterson for failing to investigate the PREA claims Plaintiff wished to pursue against Trapp. Doc. 1, ¶¶88-89, 95, 101.

Plaintiff argues that the Court may exercise supplemental jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367(a), which provides in pertinent:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

"The concept of supplemental jurisdiction, first codified in 28 U.S.C. § 1367 in 1990, has its origins in the judicial doctrine of pendent jurisdiction, discussed by the United States Supreme Court in *United Mine Workers v. Gibbs*, 383 U.S. 715, 725–29 (1966)." *Valencia ex rel. Franco v. Lee*, 316 F3d 299, 305 (2d Cir. 2003) (lateral citations omitted). Under *Gibbs*, "a federal court has jurisdiction over an entire action, including state-law claims, whenever the federal-law claims and state law claims in the case 'derive from a common nucleus of operative fact' and are 'such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding.'" 316 F.3d at 305 (citing and quoting *Gibbs*, 383 U.S. at 725). District courts apply the "common nucleus of operative fact" test to determine whether supplemental jurisdiction exists in a given case. *See, e.g., Morris v. Yale Univ. Sch. of Med.*, No. 05CV848 (JBA), 2006 WL 908155. at *3 (D.Conn. April 4, 2006).

Moreover, the Second Circuit stated of the Article III constitutional concept: "A state law claim forms part of the same controversy if it and the federal claim derive from a common nucleus of operative fact. This is so even if the state law claim is asserted against a party different from the one named in the federal claim." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004) (citations and internal quotation marks omitted).

As discussed *supra*, the only plausible constitutional claims set forth in Plaintiff's Complaint include: the Fourth Amendment claim against Peterson for invasion of privacy with respect to the strip search upon Plaintiff's transfer to the segregation unit on March 13, 2017 and the Eighth Amendment claim against Watson for deliberate indifference to the hazardous condition of black mold on the vent of his segregation cell. The sole state law claim that derives from a common nucleus of operative fact with the remaining federal claims is Plaintiff's negligence claim against Watson for dismissing Plaintiff's complaint regarding the black mold in his segregation cell. Thus,

the court cannot exercise supplemental jurisdiction over Abrams' negligence claims against Trapp for sexual harassment, slander claim against Trapp for filing a false disciplinary report, negligence claim against Erfe regarding the mold in his segregation cell, and negligence claim against Peterson for failure to investigate PREA claims. These claims must be dismissed.[10]

Furthermore, Abrams cannot state a plausible claim for negligence against Watson because this claim is barred by Conn. Gen. Stat. § 4-165. Under Connecticut law, "state employees may not be held personally liable for their negligent actions performed within the scope of their employment." *Miller v. Egan*, 265 Conn. 301, 319 (2003) (citing Conn. Gen. Stat. §4-165). Therefore, if a corrections officer or prison official acts negligently, as opposed to wantonly or recklessly, in the scope of his employment, Conn. Gen. Stat. § 4-165(a) bars recovery on a negligence claim. Plaintiff's negligence claim against Watson must be dismissed.

## H.     Declaratory Relief

Abrams seeks declaratory judgments against all defendants for their alleged constitutional violations. Doc. 1, ¶¶ 24-26. Declaratory relief operates prospectively "to enable parties to adjudicate disputes before either side suffers great damage." *In re Combustion Equip. Assocs., Inc.*, 838 F.2d 35, 37 (2d Cir. 1988). In particular, "[t]o obtain prospective relief, such as a declaratory judgment or an injunction, a plaintiff must show, *inter alia*, "a sufficient likelihood that he [or she] will again be wronged in a similar way." *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)), *cert. denied*, 568 U.S. 1212

---

[10]   The Court notes that even if it had supplemental jurisdiction over the negligence claims against Trapp (for sexual harassment), Erfe (regarding the mold in the segregation cell), and Peterson (for failure to investigate PREA claims), these claims would be barred by Conn. Gen. Stat. § 4-165, which bars negligence claims against a state employee acting within the scope of his or her employment.

(2013). "That is, a plaintiff must demonstrate a "certainly impending" future injury." *Marcavage*, 689 F.3d at 103 (citing *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

In this action, the claims that this Court has deemed plausible and will allow to proceed – namely the Fourth Amendment claim against Peterson for invasion of privacy during the strip search and the Eighth Amendment claims against Watson for unconstitutional conditions of confinement – concern *past* problems during incarceration at Cheshire C.I., a facility where Plaintiff was previously housed. These claims include no alleged ongoing or future suffering at Corrigan. In sum, Abrams has not identified any prospective legal relationships or issues that require resolution via declaratory relief. All claims for declaratory relief will be dismissed.

## I.     Claims Against Defendants in their Official Capacities

Abrams is suing all defendants except Peterson in their official and individual capacities. Doc. 1, ¶¶4, 6. As set forth *supra*, the only plausible claims remaining in this action are: the Fourth Amendment claim against Peterson for invasion of privacy during the strip search and the Eighth Amendment claims against Watson for unconstitutional conditions of confinement. As to Peterson, she is sued solely in her individual capacity so there are no claims in which she is sued in her official capacity. However, as to Watson, to the extent Abrams seeks damages against him in his *official* capacity for an Eighth Amendment violation of unconstitutional conditions of confinement, that claim is barred by the Eleventh Amendment. *See Kentucky v. Graham*, 473 U.S. 159 (1985).[11]

---

[11] The Court further notes that under 42 U.S.C. § 1983, an injured party may bring an action to impose liability against "[e]very person" who, acting under color of state law, violates another person's federally protected rights. However, in *Will v. Michigan Department of State Police*, 491 U.S. 58, 71 (1989), the United States Supreme Court held "that neither a State nor its officials acting in their official capacities are 'persons' under § 1983." Therefore, to the extent that Watson has been sued in his official capacity for damages and retrospective relief for a violation of federal law under section 1983, he is not a "person" subject to section 1983 liability. *See also Smith v. Martuscello*,

"The Eleventh Amendment precludes suits against states unless the state expressly waives its immunity or Congress abrogates that immunity." *Li v. Lorenzo*, No. 16-3530, 2017 WL 4410586, at *1 (2d Cir. Oct. 4, 2017) (citing *CSX Transp., Inc. v. N.Y. State Office of Real Prop. Servs.*, 306 F.3d 87, 94-95 (2d Cir. 2002)). "This includes suits against state officials in their official capacities." Li, 2017 WL 4410586, at *1 (citing *Davis v. New York*, 316 F.3d 93, 101-02 (2d Cir. 2002)). *See also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984) ("The Eleventh Amendment bars a suit against state officials when the state is the real, substantial party in interest.") (citation and internal quotation marks omitted); *Santiago v. New York State Dep't of Corr. Servs.*, 945 F.2d 25, 28 n. 1 (2d Cir.1991) ("When the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants.") (citation and internal quotation marks omitted). Accordingly, claims brought against corrections officer defendants in their official capacities are properly dismissed for lack of jurisdiction.

Granted, as to injunctive relief, in *Edelman v. Jordan*, 415 U.S. at 664 (1974), the Supreme Court held that the Eleventh Amendment does not bar an action against a state official for violation of federal law if the plaintiff seeks an injunction regarding that official's future conduct. *See also Feng Li v. Rabner,* 643 F. App'x 57, 57-59 (2d Cir. 2016) ("As to the individual defendants, generally, state officials are not immune under the Eleventh Amendment if the "complaint alleges

602 F. App'x 550, 551 (2d Cir. 2015) ( "A suit against a state officer in his official capacity is, of course, a suit against the State. Because a governmental entity is liable under § 1983 only when the entity itself is a moving force behind the deprivation, in order for [the plaintiff] to have a viable claim against the Supervisory Defendants, he must allege a state ' 'policy or custom' [that] played a part in the violation of federal law.' ") (quoting *Kentucky v. Graham*, 473 U.S. 159 (1985) (some citations and internal quotations omitted). Plaintiff has alleged no official prison policy or custom regarding the disregard of mold in segregation cells.

an ongoing violation of federal law and seeks relief properly characterized as prospective." ) (quoting *Verizon Maryland, Inc. v. Pub. Serv. Comm'n of Maryland,* 535 U.S. 635, 645 (2002)) (internal quotation marks omitted). In this case, however, Abrams's incarceration in the segregation unit has concluded so he seeks no injunctive or prospective relief against Watson. His claims against Watson in his official capacity will be dismissed for lack of jurisdiction. *See Watson v. Doe*, 15 Civ. 1356 (BKS) (DEP), 2016 WL 347339, *41 n.5 (N.D.N.Y. Jan. 28, 2016) (dismissing all claims against defendants in official capacities when plaintiff does not seek declaratory or injunctive relief).

Although Plaintiff's claims against Watson in his official capacity are barred by the Eleventh Amendment, Abrams's Eighth Amendment claim against Watson, as well as his Fourth Amendment claim against Peterson for invasion of privacy (during the strip search), will proceed against these defendants in their *individual* capacity for damages.

## IV.  CONCLUSION AND ORDERS

(1)  For the reasons stated herein, all claims against Trapp, Erfe, and Doe are DISMISSED.

(2)  The case may proceed only on the following federal claims: (a) the Fourth Amendment claim against Peterson for invasion of privacy during the March 13, 2017 strip search (during Plaintiff's transfer to the segregation unit) and (b) the Eighth Amendment claim against Watson for unconstitutional conditions of confinement (with respect to the black mold on the cell vent). Each of these claims may proceed only against the pertinent defendant in her or his individual capacity for damages. The Eighth Amendment claim against Watson in his official capacity is barred by the Eleventh Amendment.[12]

(3)  All claims for declaratory relief and state law claims are DISMISSED.

---

[12]  Plaintiff brings his claim against Peterson solely in her individual capacity.

(4)  The Clerk shall verify the current work addresses for Peterson and Watson with the Department of Correction Office of Legal Affairs, mail a waiver of service of process request packet containing the Complaint to each defendant at the confirmed address within **twenty-one (21) days** of this Order, and report to the Court on the status of the waiver request on the **thirty-fifth (35) day** after mailing.  If either defendant fails to return the waiver request, the Clerk shall make arrangements for in-person service by the U.S. Marshals Service on her or him, and the defendant shall be required to pay the costs of such service in accordance with Fed. R. Civ. P. 4(d).

(5) Peterson and Watson shall file their response(s) to the Complaint, either an answer or motion to dismiss, within **sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to them.  If either defendant chooses to answer, as opposed to otherwise respond, she or he shall admit or deny the allegations and respond to the cognizable claims recited above.  She and/or he may also include any and all additional defenses permitted by the Federal Rules.

(6)  Discovery, pursuant to Federal Rules of Civil Procedure 26 to 37, shall be completed within **six months (180 days)** from the date of this Order.  Discovery requests need not be filed with the Court.

(7)  All motions for summary judgment shall be filed within **seven months (210 days)** from the date of this Order.

The foregoing is So Ordered.

Signed: New Haven, Connecticut
         February 2, 2018

/s/Charles S. Haight, Jr.
CHARLES S. HAIGHT, JR.
Senior United States District Judge

39