## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

DAVID A. ABRAMS, No. 241224, a/k/a
ABRAHAMS,

        Plaintiff,

  v.

WARDEN SCOTT ERFE, CAPTAIN JOHN
WATSON, MAINTENANCE SUPERVISOR
JOHN DOE, AND COUNSELOR TRAPP,
sued in their individual and official capacity;
and COUNSELOR SUPERVISOR
PETERSON, sued in her individual capacity,

        Defendants.

Civil Action No.
3: 17 - CV - 1570 (CSH)

JULY 3, 2018

### RULING ON PLAINTIFF'S MOTION TO AMEND COMPLAINT [DOC. 11]

**Haight, Senior District Judge:**

## I.  INTRODUCTION

On September 20, 2017, *pro se* Plaintiff David A. Abrams, an inmate currently incarcerated

at Corrigan-Radgowski Correctional Center in Uncasville, Connecticut ("Corrigan"), filed a civil

rights complaint pursuant to 42 U.S.C. § 1983 against various prison officials of Cheshire

Correctional Institution ("Cheshire C.I."), where he was previously housed.  Plaintiff alleged a

number of constitutional and state law violations against these defendants, who included: Warden

Scott Erfe, Captain John Watson, Maintenance Supervisor John Doe, Counselor Trapp, and

Counselor Supervisor Peterson.  On February 2, 2018, this Court issued its Initial Review Order

("IRO") dismissing all but two of Abrams's  claims:  (1) the Fourth Amendment claim against

Peterson for invasion of privacy with respect to a strip search during Abrams's transfer to the

segregation unit on March 13, 2017; and (2) the Eighth Amendment claim against Watson for acting with deliberate indifference to the hazardous condition of black mold on the vent in Plaintiff's segregation cell. *See Abrams v. Erfe*, No. 3:17-CV-1570 (CSH), 2018 WL 691714, at \*19 (D. Conn. Feb. 2, 2018). The Court permitted those two claims to proceed against Peterson and Watson in their individual capacities for damages. *Id.*

Nineteen days later, on February 21, 2018, Abrams filed his "Motion for Leave to File an Amended Complaint" [Doc. 11] with an attached proposed amended complaint. Plaintiff states that through his amended complaint, he seeks to: (1) replace the phrase "indecent exposure" with "public indecency," as stated several times in the complaint; and (2) allege sufficient facts to support the claims dismissed by this Court in its IRO. Doc. 11, at 1-2 (¶¶ 1-3). For the following reasons, the Court will GRANT the motion for leave to file an amended complaint and accept the amended complaint. However, before accepting it, the Court must review the amended complaint and dismiss any claims which fail to state claims upon which relief may be granted, 28 U.S.C. § 1915A.

## II. DISCUSSION

### A. Standard for Leave to Amend - Rule 15, Fed. R. Civ. P.

Pursuant to Rule 15(a), Fed. R. Civ. P., a plaintiff may amend his complaint once as a matter of course within twenty-one days after service of the complaint or within twenty-one days after service of a responsive pleading (*i.e.*, answer or motion to dismiss) or of a Rule 12(b), (e), or (f) motion, whichever is earlier. *See* Fed. R. Civ. P. 15(a)(1)(A) and (B). *See also, e.g., Baines v. Pillai,* No. 3:16-CV-01374 (CSH), 2017 WL 1375168, at \*1 (D. Conn. Apr. 10, 2017)*; Taurus B, LLC v. Esserman,* No. 3:14-CV-715 CSH, 2014 WL 4494398, at \*1 (D. Conn. Sept. 12, 2014).

In all other cases, the plaintiff may amend his complaint only with "the opposing party's

written consent or the court's leave," which should be "freely give[n] when justice so requires." Fed. R. Civ. P. 15(a)(2). "In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, futility of the amendment, etc. – the leave should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962) (discussing Rule 15(a)). "This relaxed standard applies with particular force to *pro se* litigants." *Pangburn v. Culbertson*, 200 F.3d 65, 70 (2d Cir. 1999). "A *pro se* complaint is to be read liberally, and should not be dismissed without granting leave to amend at least once when such a reading gives *any* indication that a valid claim *might* be stated." *Id.* (emphasis in original; citation, internal quotation marks, and brackets omitted).

In the case at bar, Abrams filed his motion for leave to amend and his amended complaint within twenty-one days after service of his initial complaint. Therefore, Abrams is entitled to amend his complaint once as a matter of right under Rule 15(a)(1). The Court will thus grant the motion to amend and accept the amended complaint. The remaining issue the Court must resolve is which claims may now proceed under 28 U.S.C. § 1915A.

## B. Standard for Screening under Section 1915A

Because the amended complaint will become the operative complaint in this action, the Court must perform its mandatory screening of the claims under 28 U.S.C. § 1915A to determine whether they state claims upon which relief may be granted. In its IRO, the Court set forth the applicable standard of review for analyzing a *pro se* prisoner's civil rights complaint under this statute. 2018 WL 691714, at *1-2 . Specifically, pursuant to § 1915A, the Court must review the complaint and dismiss any portion that "(1) is frivolous, malicious, or fails to state a claim upon which relief may

be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." *See* 28

U.S.C. § 1915A(b)(1)-(2).[1]  Highly detailed allegations are not required, but the complaint "must

contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S 544,

570 (2007)).[2]  "A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Iqbal*, 556 U.S. at 678.  The complaint must provide "more than the unadorned, the-defendant-

unlawfully-harmed-me accusation."  *Id*.  "A pleading that offers 'labels and conclusions' or 'a

formulaic recitation of the elements of a cause of action will not do.'"  *Id*. (quoting *Twombly*, 550

U.S. at 555).

      "Although all allegations contained in the complaint are assumed to be true, this tenet is

---

[1] *See also* 28 U.S.C. § 1915(e)(2)(B), which applies to plaintiffs who have been granted *in forma pauperis* ("IFP") status and provides:

> Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that–
> . . .
>     (B) the action or appeal–
>         (i) is frivolous or malicious;
>         (ii) fails to state a claim on which relief may be granted; or
>         (iii) seeks monetary relief against a defendant who is immune
>         from such relief.

Plaintiff is *pro se* and has IFP status so § 1915(e) imposes an additional duty on this Court to review his amended complaint to  dismiss any claims which may not afford him relief.

[2] The Second Circuit has consistently adhered to the United States Supreme Court's seminal plausibility standard set forth in *Iqbal*.  *See, e.g., Giunta v. Dingman,* No. 17-1375-CV, __F.3d__, 2018 WL 3028686, at *3 (2d Cir. June 19, 2018); *Bd.-Tech Elec. Co. v. Eaton Corp.,* No. 17-3829-CV, __F. App'x__, 2018 WL 2901336 (2d Cir. June 11, 2018); *Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 94 (2d Cir. 2017).

'inapplicable to legal conclusions.'" *LaMagna v. Brown*, 474 F. App'x 788, 789 (2d Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678). Therefore, the Court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quoting *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir.2008) (internal quotation marks omitted)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

Because Plaintiff is a *pro se* litigant, his "[*p*]*ro se* submissions are reviewed with special solicitude, and 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Matheson v. Deutsche Bank Nat'l Tr. Co.*, 706 F. App'x 24, 26 (2d Cir. 2017) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)(per curiam)). *See also Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (same)*; Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants).

Despite being subject to liberal interpretation, a *pro se* plaintiff's complaint still must "state a claim to relief that is plausible on its face." *Mancuso v. Hynes*, 379 F. App'x 60, 61 (2d Cir. 2010) (*quoting Iqbal*, 556 U.S. at 678). Therefore, even in a *pro se* case, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (citation and internal quotation marks omitted). Nor may the Court "invent factual allegations that [the plaintiff] has not pled." *Id*.

## C. Plaintiff's Amended Claims

Although Abrams fails to designate which of the previously dismissed claims he seeks to reinstate, he notes that he has supplemented his allegations from page 13, paragraph 64, to the end

of page 21. Doc. 11, at 1-2. Based on the Court's review of his amended complaint, two claims Plaintiff has attempted to supplement, in an effort to reinstate them into this action, are his Eighth Amendment claims against Trapp: sexual abuse and retaliation. As to defendant Trapp, he also now attempts to state a tort claim for fraud against her for "falsely accusing him of exposing himself to her." Do. 11-1, ¶ 102. In addition, Plaintiff seeks to expand his Fourth Amendment claim regarding an unreasonably "intrusive strip search" to challenge the policy itself as unreasonable. *Id.*, ¶¶ 75-85.

To clarify, the entire list of claims Plaintiff now attempts to assert in his amended complaint include: sexual abuse or harassment by Trapp in violation of the Eighth Amendment; Fourth and Eighth Amendment claims against Peterson, Watson, and Erfe for an unreasonably intrusive strip search conducted on March 13, 2017; retaliation and fraud against Trapp; Fourth Amendment claim that the "strip search" policy at Cheshire C.I. is generally unconstitutional; Eighth Amendment claim against Watson and Erfe for acting with deliberate indifference to the hazardous condition of black mold on the vent in Plaintiff's segregation cell; and negligence against Maintenance Supervisor Doe for failing to maintain a hazard free living condition of confinement regarding the black mold on Plaintiff's cell vent in segregation.[3] Plaintiff also requests declaratory relief as to each of his claims.

---

[3] The state law claims Plaintiff now attempts to plead are fraud against Trapp and negligence against Doe. In his original complaint, Abrams had raised the following state law claims: (1) negligence against Trapp for sexually harassing Abrams; (2) slander against Trapp for filing a false disciplinary report; (3) negligence against Watson and Erfe for "failure to maintain hazard free living conditions in segregation" (regarding "the black mold on the vents" in the segregation unit); and (4) negligence against Peterson for failing to investigate the PREA claims Plaintiff wished to pursue against Trapp. Doc. 1, ¶¶ 88-89, 95, 101. The Court held that all but the negligence claim against Watson failed to derive from a common nucleus of operative fact with the remaining federal claims so that the Court could not exercise supplemental jurisdiction over them. 2018 WL 691714, at *17. Moreover, in any event, the negligence claim against Watson was barred by Conn. Gen. Stat. § 4-165, under which "state employees may not be held personally liable for their negligent actions performed within the scope of their employment," *Miller v. Egan*, 265 Conn. 301, 319 (2003) (citing Conn. Gen. Stat. § 4-165). *See* 2018 WL 691714, at *18. All of Plaintiff's state law claims were

The Court will review these claims to determine which, if any, may proceed as stating a claim upon which relief may be granted.

1.    **Eighth Amendment Claim of Sexual Abuse**

In his initial complaint, Abrams attempted to state an Eighth Amendment sexual abuse claim against Trapp.  In his Amended Complaint, he has once again pled such a claim with the following allegations.  In January 2017, while he was housed at the Cheshire Correctional Institution ("C.I."), he was employed to clean showers.  Doc. 11-1, ¶ 10. Counselor Trapp (a female) was the inmate counselor for Unit 3, where Abrams resided.  *Id.*, ¶¶ 11-12.  In February 2017, Abrams asked Trapp for "state soap and envelopes . . . to which he [was] not entitled . . . because he was employed." *Id.,* ¶ 13.  Trapp allegedly smiled at Abrams and said, "See, life can be made easy for you in here." *Id.,* ¶ 15.  She handed Abrams four bars of soap and four pre-stamped envelopes.  *Id.*  Abrams replied, "Thanks, I appreciate you!" *Id.,* ¶ 16.  Trapp allegedly responded by saying, "Do you really?  We'll see on my tour." *Id.*

According to Plaintiff, over the next few days, Trapp stopped by Abrams's cell door between 12:30 p.m. and 1:30 p.m. and watched him work out while wearing only his gym shorts.  *Id.,* ¶ 17.  On these occasions, Trapp allegedly smiled at Abrams and gave him a "thumbs-up" signal.  *Id.*  On four different occasions over the next couple of weeks, Trapp "would stop by [Abrams's] cell while his cell window was partially covered for privacy" and watch Abrams "urinate, masturbate, and washup while [he was] fully naked" after working out.  *Id.,* ¶ 18.  She would allegedly smile at Abrams for three to five seconds and then continue on her tour. *Id.* During this time, Trapp gave Abrams multiple bars of soap and envelopes, which Abrams sold to other inmates in the unit for

_____

thus dismissed.

profit. *Id., ¶* 20.

Abrams alleges that "[d]ue to her strong[,] masculine . . . features," he found Trapp to be "extremely unattractive" so he was "an unwilling participant in her inappropriate conduct." *Id., ¶* 21. Nevertheless, he did not want to report her out of "fear of embarrassment, ridicule," and retaliation, or as he describes, "what Trapp could do to him and for him." *Id., ¶* 22.

On numerous occasions, Abrams allegedly "went to see Trapp for a printout of his inmate account or to get soap and envelopes." *Id., ¶* 24. During these times, Trapp would allegedly pose provocatively, "bend[ing] over at the waist," "spread[ing] her legs while seated in front of him," and/or "lean[ing] forward with her loose-fitted, low-cut blouse" exposing her cleavage. *Id., ¶¶* 24-26. Abrams states that he "would laugh to himself" because he "found her unattractive" in that she was "built like a 12 year old girl." *Id., ¶* 25.

On March 3, 2017, Abrams argued with Trapp "over his placement at the bottom of the list for industry jobs that pay up to $150 monthly." *Id., ¶* 27. Afterward, Abrams stopped communicating with Trapp; and Trapp no longer stopped at Abrams's cell door during her tour of the unit. *Id., ¶¶* 27-28.

On March 13, 2017, administrators placed Cheshire on "modified lockdown" because Governor Malloy was touring the facility. *Id., ¶* 29. During this time, no inmates were permitted in any area outside of their cells except for those inmates who worked in the facility's industry unit, which included Abrams's cellmate. *Id., ¶¶* 30, 33. Sometime between 11:30 a.m. and 11:45 a.m. on that date, Abrams alleges he partially covered his cell window for privacy. *Id., ¶* 35. He decided to take advantage of the lockdown to do personal grooming ("groom his pubic area" or perform "manscaping," as he terms it) while naked. *Id.* He retrieved his beard trimmer, removed all of his

clothing, and began his task "over his toilet" in his cell. *Id.,* ¶¶ 37-38. While trimming his hair, he

saw the shadow of a figure move in front of the cell window and then walk away. *Id.,* ¶¶ 40-41.

Abrams could not identify the person at the window so "continued to 'manscape.'" *Id.,* ¶ 42.

Relying on the Second Circuit's decisions in *Boddie v. Schneider*, 105 F.3d 857, 861 (2d Cir.

1997), and *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015), the Court previously dismissed

Abrams's Eighth Amendment claim against Trapp because the facts alleged did not rise to the level

of severity to create a constitutional harm. 2018 WL 691714, at *5-7. "In order to determine

whether alleged sexual abuse rises to the level of an Eighth Amendment violation, one must examine

the particular facts set forth in the claim." *Id.*, at *5. After closely reviewing the facts, the Court

summarized as follows:

> Unlike in *Crawford*, there has been no alleged sexually suggestive or any other kind
> of physical contact between Trapp and the Plaintiff. Rather, Abrams alleges that
> Trapp gave him soap and envelopes, watched him work out in his gym shorts,
> observed him through his cell window, smiled at him during times of partial privacy
> (as he carried out acts of hygiene), and on at least two occasions, posed in allegedly
> seductive or provocative manners in Abrams's presence. None of these incidents was
> "severe" enough to be deemed "objectively, sufficiently serious."

*Id.*, at *6.

Abrams did not claim that there was any physical contact by Trapp, nor did he allege that he

was traumatized as a result of Trapp's behavior. He even reaffirmed in his Amended Complaint that

he found her suggestive conduct laughable due to her "unattractive" appearance. Doc. 11-1, ¶ 72

(He "would laugh to himself because Trapp was built like a 12 year old girl in his opinion and he

found her unattractive."). Moreover, Trapp had a valid penological interest in observing Abrams

during her rounds as a guard at Cheshire C.I.. 2018 WL 691714, at *7. "Observing prisoners

through their cell windows is incidental to one's official and necessary duties as a prison guard." *Id.*

In sum, Trapp's conduct, as alleged, was not "cumulatively egregious" or sufficiently "repugnant to the conscience of mankind" to rise to the level of an Eighth Amendment claim for sexual abuse. *Id.* (quoting *Boddie*, 105 F.3d at 861, and *Crawford*, 796 F.3d at 257).

In his amended complaint, Abrams challenges the Court's finding that Trapp had a valid penological interest in observing him through his cell window. He argues that it is not normal practice for female correction staff members to look into an inmate's cell when the window is covered; and in this case, there were "no exigent circumstance[s] to prompt Counselor Trapp to look into [his] cell." Doc. 11-1, ¶¶ 66-70.[4]

However, as Plaintiff alleged in his amended complaint, Trapp was brief in viewing Plaintiff as she made her rounds of the cells. While "doing her tour and passing out paperwork," Trapp generally stopped at his window for "three to five seconds" and then resumed her tour of the cell block. Doc. 11-1, ¶ 18. Moreover, on March 13, 2017, the day he allegedly 'manscaped' with his window partially covered, the prison was observing heightened security (on "modified lockdown") during Governor Malloy's visit. Id., ¶¶ 29-30. On that date, Plaintiff only saw "a shadow of someone walking away." *Id.*, ¶ 41. He "never saw who was at the door watching him . . . [so] he continued to 'manscape.'" *Id.*, ¶ 42. Plaintiff was thus unable to determine whether a male guard, a prison official, or even a fellow prisoner walked by his cell window on that day. He also does not know how long or directly that person may have viewed him.

---

[4] Plaintiff admitted in his complaint, and again in his amended complaint, that he was never even able to identify who went past his window on Mar 13, 2017, when he was grooming himself or 'manscaping.' He simply alleged that he saw "a shadow of someone walking away." Doc. 11-1, ¶ 41. He "never saw who was at the door watching him . . . [so] he continued to 'manscape.'" *Id.*, ¶ 42. Because he did not see who was at his door, he has no proof or details regarding Trapp's observation of him on March 13, 2017.

In addition, Plaintiff focuses on Trapp's suggestive behavior whenever he went to see her to retrieve his inmate account or for soap and envelopes. He alleges that she would turn her back to him, bend over at the waist, spread her legs, and look back up at him with a smile. *Id.,* ¶ 71. On occasion, she would also lean forward and expose her cleavage while standing at her desk. *Id.,* ¶ 73. However, as discussed *supra*, that behavior never escalated into any sexual proposition or physical contact. Moreover, rather than being offended or traumatized, Abrams's reaction was one of mirth. He "would laugh to himself" because he thought "Trapp was built like a 12-year-old girl . . . and he found her unattractive." *Id.,* ¶ 72.

When examined in their totality, Plaintiff's allegations in his amended complaint regarding his Eighth Amendment claim against Trapp fail to cure the deficiencies of those in the initial complaint. "To constitute a constitutional violation, there must be 'severe or repetitive sexual abuse' which is 'cumulatively egregious,' *Boddie*, 105 F.3d at 861, or conduct which is 'repugnant to the conscience of mankind' such that it is 'incompatible with evolving standards of decency,' *Crawford*, 796 F.3d at 257." 2018 WL 691714, at *7. Although Trapp's alleged conduct may have been unprofessional and inappropriate, it did not rise to the level of constitutional harm contemplated by *Boddie* and *Crawford*.

Moreover, Abrams has reaffirmed the Court's finding that, rather than being harmed or traumatized by Trapp's behaviour, he was admittedly amused, causing him to "laugh to himself." Doc. 11-1, ¶ 72. Abrams's request to reinstate his Eighth Amendment claim against Trapp for sexual abuse is denied.

The Court notes that under his sexual abuse claim, Plaintiff also includes language alleging an "invasion of privacy" by Trapp in viewing him during "manscaping." Doc. 11-1, at 13. Courts

in this Circuit and around the country have recognized that a prisoner's privacy interest must be balanced against the State's legitimate equal employment and penological interests. Incidental, brief viewing of an inmate's naked body by an opposite sex guard has been held not to violate the inmate's constitutional rights. *See, e.g., Baker v. Welch*, No. 03CIV.2267(JSR)(AJP), 2003 WL 22901051, at *20 (S.D.N.Y. Dec. 10, 2003) (indicating that "a female parole officer is allowed to conduct a urine test of a male parolee and observe the test from a distance that does not provide a direct view of the male parolee's genitals"). *See also Rogers v. Clark*, 94–CV–0444, 1996 WL 328218 (W.D.N.Y. June 11, 1996) ("Bashfulness is not a protectable fundamental right or liberty interest. Further, to the extent that a glance at the unclothed body of a prisoner from a member of the opposite sex might be considered a search worthy of Fourth Amendment scrutiny, the incident was utterly harmless.")*; Sinclair v. Stadler,* No. 03–30456, 78 F. App'x. 987, 989 (5th Cir. Oct. 28, 2003) ("[T]he state's policy of using female officers to supervise the living areas of [plaintiff's] prison unit is reasonably related to legitimate penological objections, including flexibility in security personnel staffing and equal employment opportunity."); *Sattler v. Foster*, No. 01–35733, 37 F. App'x 311, 312 (9th Cir. June 10, 2002) ("Occasional viewing of male prisoners by female correctional officers does not violate the Fourth Amendment right to privacy or the Eighth Amendment prohibition against cruel and unusual punishment."); *Johnson v. Phelan*, 69 F.3d 144, 146–47 (7th Cir.1996) ("Unless female guards are shuffled off to back office jobs, . . . they are bound to see the male prisoners in states of undress. . . . . Otherwise they are not doing their jobs ... If only men can monitor showers, then female guards are less useful to the prison ..."), *cert. denied*, 519 U.S. 1006 (1996); *Letcher v. Turner*, 968 F.2d 508, 510 (5th Cir.1992) ("[T]his Court [has] held that no constitutional violation occurs when naked male inmates are viewed by female guards if the presence of female

guards is required to protect a legitimate government interest such as maintaining security at a correctional facility.").  Observing prisoners briefly in their cells, even those of the opposite sex,  is an incidental and necessary duty of the position of being a guard.

In the case at bar, the "manscaping" incident of which Plaintiff complains – *i.e.*, allegedly being viewed by Trapp, a female guard, at a distance, through a window, and during the middle of a "lockdown" – involves a situation where the prison has a valid penological interest in maintaining security by checking on inmates.  Furthermore, as to this event, Plaintiff was unable to assert that he witnessed her watching him so he cannot claim that he noted something improper in that viewing.[5]  All he alleges is that a shadow of someone briefly passed his window. Doc. 11-1, ¶¶ 41-42.  If he had been concerned with his modesty, nothing prevented him from dressing or concealing, rather than exposing, his genitals.  In sum, whether framed as a claim for invasion of privacy or sexual abuse, Plaintiff has failed to state a plausible claim against Trapp.

### 2.    <u>Retaliation</u>

In his amended complaint, Abrams once again claims that Trapp filed a false disciplinary report against him for exposing himself to her in retaliation for an argument he had with her about

---

[5]  The Court notes that Trapp concedes that she looked into Plaintiff's cell on March 13, 2017, because she  wrote up the incident in a disciplinary report in which she accused him of exposing himself to her.  Doc. 1, at 30.  Trapp thus wrote:

> On Monday, March 13, 2017 at 11:45 A.M., while touring South Block 2, Inmate Abrahams [known as Abrams in this case] intentionally exposed his penis through his boxers while I was looking through his cell door. Due to his intentional exposure, Inmate Abrahams is being issued a Class A DR for public indecency.

*Id.*  That charge was allegedly proven during an evidentiary hearing before a hearing officer.  Doc. 1, at 31 ("Disciplinary Process Summary Report").  *See* n.6, *infra,* discussing term "public indecency."

job placement and his decision to stop speaking with her afterward. Doc. 11-1, ¶¶ 86-90. In its IRO, the Court summarized its findings as follows:

> Nothing in the report or its investigation suggests a link between any protected speech or conduct by Plaintiff and the disciplinary report. The argument Plaintiff allegedly had with Trapp was "over his placement at the bottom of the list for industry jobs that pay up to $150 monthly." Doc. 1, ¶ 71. The argument had no bearing on Trapp's alleged "sexual abuse and invasion of privacy" of Plaintiff. *Id.*, ¶ 70. "Cases supporting retaliation claims for inmate statements concern actions taken in response to the inmate filing a grievance, instituting a lawsuit or making a complaint to prison officials regarding the conduct of correctional staff." *Riddick*, [v. *Arnone*, No. 11 Civ. 631 (SRU)], 2012 WL 2716355, at *7 [(D. Conn. July 9, 2012)] (citing *Ramsey v. Goord*, 661 F.Supp.2d 370 (W.D.N.Y. 2009)). Any complaints that Plaintiff made regarding Trapp's conduct were made after her disciplinary report, not before it. Doc. 1, ¶¶ 50-51. Therefore, there are no indications that the alleged argument involved any protected speech.
>
> Furthermore, "[w]ith regard to false misbehavior reports, the type of evidence required to establish a causal connection between the plaintiff's protected conduct and the alleged retaliation include temporal proximity, prior good discipline, a finding of not guilty at the disciplinary hearing and statements from the defendants regarding their motives." *See Barclay v. New York*, 477 F. Supp. 2d 546, 558 (N.D.N.Y. 2007). In this case, the report against Abrams was made more than a week after his alleged fight with Trapp; Abrams was found guilty at the disciplinary hearing, and there are no statements by Trapp to suggest she had a retaliatory motive in filing the report. In sum, Plaintiff has failed to sufficiently allege that he engaged in protected speech causally connected to the disciplinary report. He has also failed to allege facts to show that the report was false and/or motivated by retaliation.

2018 WL 691714, at *8. Abrams failed to allege a link between any protected speech and the disciplinary report so failed to state a plausible First Amendment retaliation claim against Trapp. *Id.*

In his amended complaint, Abrams challenges the validity of the disciplinary report, claiming that it was "false" and "fraudulent."[6] Doc. 11-1, ¶¶ 91-97. He argues that "[t]he fraudulent

---

[6] Throughout his amended complaint, Plaintiff makes much of the fact that he has substituted "public indecency" in place of "indecent exposure." Doc. 11, at 1. He asserts that his cell is not

14

nature of the disciplinary report tends to support [his] contention that Trapp was motivated by retaliation." *Id.,* ¶ 97. The Court does not agree. Plaintiff's allegations that the report was false are both conclusory and discredited by the evidence. Plaintiff was found guilty based on the charge in Trapp's report after an evidentiary hearing before a Hearing Officer. He was thus afforded an opportunity to present evidence on his behalf to challenge the report. He failed in this effort and was found guilty. Seeking a second bite at the apple, he now states in conclusory fashion that the report was false, demonstrating that Trapp had a retaliatory motive in filing it. Such bare-bones, conclusory allegations are insufficient to prove retaliation.[7]

---

"public" so that the charge against him was "fraudulent" and "invalid." Doc. 11-1, at ¶ 94. The Court need not focus, however, on the prison's exact terminology of the charge and/or whether a state-controlled prison cell is "public," where the meaning behind the charge is clear: rather than preserving his own personal privacy, Plaintiff allegedly exposed himself in an indecent manner to a female guard. *See also Hudson v. Palmer*, 468 U.S. 517, 527, 530 (1984) (noting that "it would be literally impossible" to maintain security "if inmates retained a right of privacy in their cells" and holding that "prisoners have no legitimate expectation of privacy [in their cells]" so that "the Fourth Amendment's prohibition on unreasonable searches does not apply in prison cells").

[7] "The Second Circuit has stated that courts must approach prisoner retaliation claims 'with skepticism and particular care,' since 'virtually any adverse action taken against a prisoner by a prison official – even those otherwise not rising to the level of a constitutional violation – can be characterized as a constitutionally proscribed retaliatory act.'" *Jones v. Goord*, No. 905-CV-1438 DNH/RFT, 2009 WL 790978, at *5 (N.D.N.Y. Mar. 23, 2009) (quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001)).

Moreover, "[e]ssentially, a court should not overturn a prison disciplinary board's finding of guilt if there is any evidence to support the board's conclusion." *Franco v. Kelly*, 854 F.2d 584, 588 (2d Cir.1988). *See also Chapple v. Keane*, 903 F. Supp. 583, 585 (S.D.N.Y. 1995) (holding allegedly false misbehavior report by prison guard, "which specified plaintiff's conduct, provides appropriate evidence to support the hearing officer's finding of guilt on one charge").

In the case at bar, the record of the Plaintiff's disciplinary hearing, signed by Hearing Officer King, indicated that on the date in question, the unit logbook confirmed the announcement that Trapp, a female, would be in the unit where Plaintiff was housed. Doc. 1, at 31. Nonetheless, despite this advance notice of Trapp's presence, the "inmate Abrahams [known as Abrams, in this case] was observed in his boxers with his penis showing through the slit of the boxers intentionally

Even had Trapp's report contained inaccuracies, there are no facts to suggest that it was filed with fraudulent intent or in retaliation for an argument between Trapp and Abrams about job placement or for any protected speech. Because Abrams has failed to allege any additional facts showing a link between protected speech and the disciplinary report at issue, his First Amendment retaliation claim is once again dismissed.

### 3. **Fraud**

To the extent Plaintiff intends to insert a fraud claim against Trapp based on her allegedly false disciplinary report, that claim must be dismissed on two grounds. First, absent a related federal claim against Trapp in this action, the fraud claim fails to derive from a common nucleus of operative fact with a federal claim herein. *See* 28 U.S.C. § 1367(a) ("[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."); *United Mine Workers v. Gibbs*, 383 U.S. 715, 725-29 (1966). Therefore, the Court cannot exercise supplemental jurisdiction over this state law fraud claim where the related federal claims are dismissed.

Furthermore, and in any event, the fraud claim fails to state a claim upon which relief may be granted. Under Connecticut common law, "[t]he elements of a fraud action are: (1) a false representation was made as a statement of fact; (2) the statement was untrue and known to be so by its maker; (3) the statement was made *with the intent of inducing reliance* thereon; and (4) *the other*

---

exposing himself." *Id*. The Hearing Officer "found the inmate guilty at the hearing based on the evidence, staff observation and documentation submitted." *Id.*

*party relied on the statement to his detriment....*" *Weinstein v. Weinstein*, 275 Conn. 671, 685 (2005)

(emphasis added). *See also Master-Halco, Inc. v. Scillia Dowling & Natarelli, LLC*, 739 F. Supp.

2d 109, 114 (D. Conn. 2010)(same). Here, Trapp made no statement to Plaintiff with the purpose

of inducing his reliance upon it, to his detriment. The fraud claim must be dismissed.

### 4.    Intrusive Strip Search

In its IRO, the Court permitted Plaintiff's claim regarding an intrusive strip search to proceed

against Peterson. After reviewing cases regarding strip searches and/or viewing of undressed

prisoners by opposite sex guards, such as *Holland v. City of New York*, 197 F. Supp. 3d 529, 543

(S.D.N.Y. 2016) and *Forts v. Ward*, 621 F.2d 1210, 1217 (2d Cir. 1980), the Court held as follows:

> Reading the *pro se* prisoner's complaint liberally, assuming the truth of its
> allegations and "interpret[ing] his complaint to raise the strongest arguments it
> suggests," *Abbas* [*v. Dixon*], 480 F.3d [636,] 639 [(2d Cir. 2007)], the search took
> place "directly in front of" an opposite-sex guard – in a manner that was not
> "indirect," "incidental," or "brief" – without a pending emergency or exigent
> circumstances, such as a violent disturbance. Such a direct and close view of an
> inmate's body during a search by an opposite sex guard may plausibly give rise to a
> Fourth Amendment claim for invasion of privacy. Plaintiff's claim may therefore
> proceed against Officer Peterson, in her individual capacity, at this time.

2018 WL 691714, at *11.

Plaintiff now seeks also to assert that the general strip search policy at Cheshire is

unconstitutional because it was more thorough than the searches inmates undergo when "returning

from court" or "an outside hospital visit," during a "random strip search," or generally being placed

in segregation. Doc. 11-1, ¶¶ 74-75. In particular, Plaintiff prefers the procedure where a prisoner

gets to "squat down and cough while fully naked," rather than "bend at the waist and spread his butt

cheeks." *Id.*, ¶¶ 75-76. He also objects to the prison's rule that an inmate be subjected to punitive

measures should he fail to submit to a strip search.

None of these allegations are sufficient to state a claim for an unreasonable strip search policy. Under *Turner v. Safley*, 482 U.S. 78, 107 (1987), a prison "regulation is valid if it is reasonably related to legitimate penological interests." This determination involves four factors:

> [(1)] whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; [(2)] whether there are alternative means of exercising the right in question that remain open to prison inmates; [(3)] whether accommodation of the asserted constitutional right will have an unreasonable impact upon guards or other inmates, and upon the allocation of prison resources generally; and [(4)] whether there are reasonable alternatives available to the prison authorities.

*Covino v. Patrissi*, 967 F.2d 73, 78-79 (2d Cir. 1992) (citing *Turner*, 482 U.S. at 89-90). It is the prisoner's burden to show that a challenged prison regulation is unreasonable. *Id.* at 79.

Here, Plaintiff has failed to prove that Cheshire's regulation regarding strip searches is unreasonable. The Supreme Court has recognized that "correctional officials must be permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities." *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 328, 344-45 (2012). For example, "courts in this District have uniformly held, in light of the Supreme Court's decision in *Florence*, that '[t]he general practice of strip searching a detainee during housing searches and on the way to and from court appearances is not unconstitutional, even if the detainee is accused only of a misdemeanor.'" *Keaton v. Ponte*, No. 16 CIV. 3063 (KPF), 2017 WL 3382314, at *12 (S.D.N.Y. Aug. 4, 2017) (citing *Thompson v. City of N.Y.*, No. 16 Civ. 824 (PKC), 2017 WL 1929552, at *2 (S.D.N.Y. May 9, 2017) (collecting cases)). *See also Perkins v. City of New York.*, No. 14 Civ. 3779 (WHP), 2017 WL 1025987, at *2 (S.D.N.Y. Mar. 15, 2017) ("Strip searches are permissible provided that the search is tied to legitimate security interests, a determination that is peculiarly

within the province and professional expertise of correctional officers. . . . And random strip searches may be conducted even in detainees' housing units.") (citations and internal quotation marks omitted); *Myers v. City of New York*, No. 11 CIV. 8525 (PAE), 2012 WL 3776707, at \*9 (S.D.N.Y. Aug. 29, 2012) ("[U]nder the standard outlined in *Florence*, the searches to which [plaintiff] was subjected were "reasonably related to legitimate security interests," including preventing the smuggling of contraband into or out of [the jail in which plaintiff was confined].") (quoting *Florence*, 566 U.S. at 326), *aff'd*, 529 F. App'x 105 (2d Cir. 2013).

In the case at bar, a Connecticut Department of Corrections ("DOC") regulation requires a strip search upon a prisoner's placement in specialized housing. *See* State of Connecticut Administrative Directive 6.7 ("Searches Conducted in Correctional Facilities"), at § 5(A)). That regulation is "reasonable and valid" because it is "reasonably related to legitimate penological interests" – ensuring that no weapon or contraband item is being transported when a prisoner is transferred into the specialized housing unit. *Holloway v. Dep't of Corr.*, No. 3:11-CV-1290 (VLB), 2013 WL 4834657, at \*5 (D. Conn. Sept. 10, 2013).

Here, the strip search conducted upon Plaintiff's transfer to segregation was an effective means of examining the Plaintiff's body cavities for contraband or weapons. To the extent he dislikes the means employed, there are no facts to suggest that the search was conducted for sexual gratification or for some other harmful purpose. *See Crawford v. Cuomo*, 796 F.3d 252, 258 (2d Cir. 2015) ("[A] search may not be undertaken maliciously or for the purposes of sexually abusing an inmate")). A strip search is an inherently intrusive procedure so that absent a form of proven abuse,

it is considered valid, as long as it is reasonable and linked to a legitimate penological purpose.[8]

Accordingly, Plaintiff's claim under the Fourth Amendment relating to the "strip search" policy at Cheshire fails to state a plausible claim and will be dismissed. However, the intrusive strip search claim may proceed against Peterson for the reasons previously stated.

### 5. Claims Against Erfe and Doe - Hazardous Conditions of Confinement

In his amended complaint, Plaintiff has attempted to reinsert Warden Erfe and John Doe, "Maintenance Supervisor of Cheshire C.I.," as defendants in the hazardous conditions of confinement claim. Doc. 11-1, at 20 (¶¶ 105, 108), at 24 (¶¶ 3, 5). As in its IRO, the Court dismisses Erfe and Doe from this action. Plaintiff has again failed to demonstrate that either defendant was "involved in, or even aware of, the black mold in the segregation unit." 2018 WL 691714, at *15 (citing *Merriwether v. Coughlin*, 879 F.2d 1037, 1048 (2d Cir. 1989) (to impose supervisory liability prisoner must allege that official had actual or constructive notice of unconstitutional practices and demonstrated gross negligence or deliberate indifference by failing to act)). Abrams included Erfe and Doe solely due to their supervisory roles at Cheshire C.I., but their positions alone do not show personal involvement in a constitutional violation.

Furthermore, to the extent that Plaintiff attempts to allege negligence against Doe, that claim is barred by Conn. Gen. Stat. § 4-165, under which "state employees may not be held personally

---

[8]As the Second Circuit has recognized, "[r]egardless of who performs the search, a visual body cavity search is invasive: 'A strip search that involves a stranger peering without consent at a naked individual, and in particular at the most private portions of that person's body, is a serious invasion of privacy.'" *Holland v. City of New York*, 197 F. Supp. 3d 529, 542 (S.D.N.Y. 2016)(quoting *Harris v. Miller*, 818 F.3d 49, 58 (2d Cir.2016)). Because such a search is invasive by nature, it must be conducted without abuse.

liable for their negligent actions performed within the scope of their employment," *Miller v. Egan*, 265 Conn. 301, 319 (2003) (citing Conn. Gen. Stat. § 4-165).

### 6. **Declaratory Relief**

Plaintiff's requests for declaratory relief are once again dismissed. As the Court previously explained in its IRO, "[d]eclaratory relief operates prospectively 'to enable parties to adjudicate disputes before either side suffers great damage.'" 2018 WL 691714, at *18 (quoting *In re Combustion Equip. Assocs., Inc.*, 838 F.2d 35, 37 (2d Cir. 1988)). In particular, "[t]o obtain prospective relief, such as a declaratory judgment or an injunction, a plaintiff must show, *inter alia*, "a sufficient likelihood that he [or she] will again be wronged in a similar way." *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)), *cert. denied*, 568 U.S. 1212 (2013). "That is, a plaintiff must demonstrate a 'certainly impending' future injury." *Marcavage*, 689 F.3d at 103 (citing *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

In the case at bar, the plausible claims that may proceed – the Fourth Amendment claim against Peterson for invasion of privacy during the strip search and the Eighth Amendment claims against Watson for unconstitutional conditions of confinement – concern past problems during incarceration at Cheshire C.I., a facility where Plaintiff was previously housed. Plaintiff is now housed in Corrigan so that there is no alleged ongoing or future suffering. Because Plaintiff has not identified any prospective legal relationships or issues that require resolution via declaratory relief, his claims for declaratory relief will be dismissed.

### III. **CONCLUSION**

In light of the fact that Plaintiff filed his request to amend his complaint within twenty-one

days after service, he may amend his complaint once as a matter of course under Rule 15(a), Fed. R. Civ. P. His pending motion to amend [Doc. 11] is thus GRANTED.

However, because Plaintiff is "a prisoner [who] seeks redress from a governmental entity or officer or employee of a governmental entity," pursuant to the Court's "screening" duty under 28 U.S.C. § 1915A, the Court shall "dismiss . . . any portion of the complaint, if the complaint – (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief."

In particular, to the extent that Abrams has, through the allegations in his Amended Complaint, requested to reinstate dismissed claims , that request is DENIED. These claims include: sexual abuse by Trapp in violation of the Eighth Amendment; Fourth and Eighth Amendment claims against Watson and Erfe for an unreasonably intrusive strip search conducted on March 13, 2017; retaliation against Trapp; Fourth Amendment claim that the "strip search" policy at Cheshire C.I. is generally unconstitutional, and Eighth Amendment claims against Watson and Erfe for acting with deliberate indifference to the hazardous condition of black mold on the vent in Plaintiff's segregation cell. Because Plaintiff has failed to allege sufficient additional facts to warrant reinstatement, each and every one is DISMISSED.

Plaintiff's newly pled state law claims for fraud against Trapp and negligence against Doe are also DISMISSED. There is no basis for this Court to exercise supplemental jurisdiction over the fraud claim; and neither the fraud claim nor the negligence claim states a claim upon which relief may be granted. In addition, Plaintiff's requests for declaratory relief, which have no basis in prospective harm, are DISMISSED.

The Amended Complaint [Doc. 11-1] is hereby accepted as the operative complaint with

respect solely to: (1) the Fourth Amendment claim against Peterson for invasion of privacy during the March 13, 2017 strip search and (2) the Eighth Amendment claim against Watson for unconstitutional conditions of confinement. Defendants must answer the Amended Complaint on or before **August 3, 2018.**

The foregoing is So Ordered.

Signed: New Haven, Connecticut
July 3, 2018

_/s/Charles S. Haight, Jr._
CHARLES S. HAIGHT, JR.
Senior United States Judge